BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      .
                           .  Case Number 21-cr-190
        Plaintiff,      .
                           .
   vs.                  .
                           .  Washington, D.C.
ZACHARY JORDAN ALAM,        .  September 8, 2023
                           .  10:05 a.m.
        Defendant.      .
- - - - - - - - - - - - - - - - - -


TRANSCRIPT OF JURY TRIAL, DAY 4
(MORNING SESSION)
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the United States:     REBEKAH LEDERER, AUSA
                           United States Attorney's Office
                           601 D Street Northwest
                           Washington, D.C. 20579

                           JOSEPH SMITH, AUSA
                           United States Attorney's Office
                           880 Front Street
                           San Diego, California 92101

For the Defendant:        STEVEN METCALF II, ESQ.
                           Metcalf & Metcalf, P.C.
                           99 Park Avenue
                           Sixth Floor
                           New York, New York 10016

Official Court Reporter:  SARA A. WICK, RPR, CRR
                           333 Constitution Avenue Northwest
                           Room 4704-B
                           Washington, D.C. 20001
                           202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

C O N T E N T S

TESTIMONY

TIMOTHY LIVELY                 Direct Examination................  803
                               Cross-Examination.................  818
                               Redirect Examination..............  828
                               Recross-Examination...............  830


KYLE YETTER                    Direct Examination................  840


EXHIBITS RECEIVED

Government 409...........................................  805
Government 408.1, 413.1, and 408.2.......................  807

P R O C E E D I N G S

(Call to order of the court.)

(Jury not present.)

COURTROOM DEPUTY:  Your Honor, we are in Criminal Action 21-190, United States of America versus Zachary Alam.

If I can have counsel approach the podium and state your names for the record, starting with the United States.

MR. SMITH:  Good morning, Your Honor.  Joseph Smith and Rebekah Lederer for the United States.  We're joined by Melissa Macechko, our paralegal, and also Rosemaria Marketos, our case agent.

THE COURT:  You can stay there, Mr. Metcalf.

MR. METCALF:  Thank you.  For Mr. Alam, Stephen Metcalf.

Good morning, Counsel.  Good morning, Your Honor.

THE COURT:  Good morning.

MR. METCALF:  Your Honor, I dropped off another suit for Mr. Alam this morning at approximately 8:15.  I would like him to be able to have another suit, especially in front of the jury.

I guess this is me asking on the record for the marshals to do whatever they can to provide him the clothes that I clearly have in his locker.

THE COURT:  Can the marshals address this?  What happened?  Do the clothes need to be provided earlier?

DEPUTY U.S. MARSHAL:  Your Honor, I'm not quite sure. I was not in the cell block this morning when he got dressed. So I can call downstairs.

THE COURT:  Mr. Alam, do you know what happened?

THE DEFENDANT:  They brought out like three bags of clothes, and I looked through them.  I didn't see another suit.

MR. METCALF:  I brought two more suits, too.

THE COURT:  I'm willing to give you time, if you want him to change.  I didn't notice that he was wearing the same suit, but --

MR. METCALF:  He's worn the same suit each time, Your Honor.

THE COURT:  He has?

MR. METCALF:  Yes.

Do you want to change?  Do you want to try to change?  It's your call.

THE DEFENDANT:  I don't think it's like too necessary.

MR. METCALF:  Are you sure?  Okay.  All right, Your Honor.  He's ready to proceed.

THE COURT:  Okay.  We'll make sure we address this. While the marshal is making a phone call right now, I know you all have a lot on your plates, but Monday morning, if you have any concerns with the revised jury instructions that went back to you, if you can let us know so we're not scrambling to do that later.

Has the government had a chance to look at them?

MS. LEDERER:  No, Your Honor.  Were they sent this morning?

THE COURT:  No.  They were sent after the last hearing.

MS. LEDERER:  Okay.  We probably started to look at them, but we will make sure that if there's any issue, that we will address that.

THE COURT:  All right.  Same for you, Mr. Metcalf. Monday, if you could.  All right?

MR. METCALF:  Absolutely.

THE COURT:  And I had said, depending on whether the government rests -- Mr. Metcalf, I know you've got a lot on your plate, but these witnesses are not presumably subpoenaed by you.

MR. METCALF:  I subpoenaed them.

THE COURT:  You have?

MR. METCALF:  Yeah.

THE COURT:  Okay.  All right.  Well, in terms of bringing them in, if we're getting to your case on Monday, I don't want to, as I've said before, bring officers in, have you put officers on the stand for a fishing expedition.  You're going to have to articulate what it is that you expect them to say.

And if there's some aspiration that they'll say something as opposed to an expectation based on what you've read about

what they've said in their reports, then I think we ought to make an inquiry before you call them to the stand.

MR. METCALF:  Understood, and I agree with Your Honor. You've made that very clear to me.  And I --

THE COURT:  It's just if you've subpoenaed them to come -- I don't know when you've subpoenaed them to come, but on Monday --

MR. METCALF:  I think the date was from today.  I mean, I haven't heard anything.

THE COURT:  Anyway, we can address this -- let's talk about this at the end of the day.  All right?

MR. METCALF:  Yes, thank you.

THE COURT:  And have the parties done redactions on the -- looked at the calendar or diary?  I know you've objected to that coming in, but I've ruled that the calendar or diary is coming in, and the government said that they were just admitting certain entries.

We don't have to do this now, but I just want to make sure on the lunch hour you all make sure there are no objections, additional objections --

MR. SMITH:  We have a hard copy of the entire notebook.  We have been trying to meet with Mr. Metcalf to go through the pages we intend to offer to see if he --

THE COURT:  You all do that at lunch.  I don't want to keep the jury waiting any longer.

Let's go ahead and bring in the jury, and we will resume with Sergeant Lively.

(Jury entered courtroom.)

THE COURT:  Good morning, ladies and gentlemen. Welcome back.  We will resume this morning with Sergeant Lively's testimony.

Ms. Lederer?

MS. LEDERER:  Thank you, Your Honor.

TIMOTHY LIVELY, WITNESS FOR THE GOVERNMENT, RESUMED STAND

DIRECT EXAMINATION (Continued)

BY MS. LEDERER:

Q.   Sergeant Lively, I believe yesterday we were discussing your time at the Speaker Lobby doors before everyone arrived.

A.   Yes.

Q.   At the point before anyone arrived, could you see what was happening behind you in the speaker's hallway lobby?

A.   The doors had been barricaded from the other side with different types of furniture, and it appeared to be that they were evacuating the members of Congress from the House Chamber.

Q.   At the point you're standing there in front of the Speaker Lobby door, what is your goal?

A.   To ensure that the members were evacuated safely.

Q.   As you're standing there, does a group eventually come up to the Speaker Lobby doors?

A.   Yes.

Q.   Could you describe that?

A.   It's a very short hallway to there.  We're facing that hallway.  They start coming through.  The individuals then see the -- us standing there, and then beyond through the windowpanes of the doorway, they can see the members evacuating, and they started to get very angry seeing them.

Q.   When you said we were standing there, just a refresher, who were you standing there with?

A.   Officer Yetter and Officer Lanciano.

Q.   If we could bring up Exhibit 409, please.  I don't believe this has been admitted yet.

     Before I admit it, Sergeant Lively, do you recognize the area in Exhibit 409?

A.   Yes.

Q.   What area is in 409?

A.   This is the Speaker's Lobby, and it's the doors that I was talking about.

Q.   Can you see yourself in this exhibit?

A.   Yes.  I'm in the right corner, wearing the blue face mask.

Q.   And presumably, is this from January 6?

A.   Yes.

        MS. LEDERER:  Your Honor, at this time, if I could move to admit Exhibit 409.

        THE COURT:  Any objection?

        MR. METCALF:  No objection, Your Honor.

THE COURT:  409 is admitted.

(Government Exhibit 409 received into evidence.)

BY MS. LEDERER:

Q.   Before we press play and it comes up on everyone's screen, Sergeant Lively, could you circle yourself, please.

A.   (Witness complied.)

Q.   Thank you.  And indicating for the record the sergeant has circled the individual on the right side of the still image of 49 -- or 409.

And if we could press play, please.

(Video played.)

BY MS. LEDERER:

Q.   Sergeant Lively, as you're standing there, what could you hear the people saying?

A.   A lot of them were yelling "this is our house" and just screaming at -- trying to scream at the members of Congress behind us.

Q.   In addition --

MR. METCALF:  Your Honor, objection as to that last answer.  It's unresponsive to the question, and I move to strike.

THE COURT:  All right.  I will strike the last portion of the answer.  The answer, "a lot of them were yelling 'this is our house' and just screaming at" remains, but the remainder is stricken.

MR. METCALF:  Thank you.

BY MS. LEDERER:

Q.   As those individuals were screaming, who is behind you?

A.   Members of Congress.

Q.   In addition to people screaming, were people doing anything else that we saw in the video?

A.   Yes.  One individual is punching the glass panes of the door that we were standing in front of.

Q.   Who was that individual?

A.   The defendant.

Q.   And as we're paused here 20 seconds into 409, do you see yourself?

A.   Yes.

Q.   Where were you in relation to that punch?

A.   I was to the left of the punch.

Q.   If we could please bring up 408, please -- 408.1, excuse me, which I believe is already in evidence.

THE COURT:  No, I don't have that.

MS. LEDERER:  Okay.  Then I'll --

THE COURT:  Are there exhibits that we can reach agreement on?

MS. LEDERER:  I provided counsel with a list yesterday.

MR. METCALF:  Your list, I have no objection to.

MS. LEDERER:  Your Honor, at this time I would

collectively move into evidence 408.1, 413.1, and 408.2.

I'm also using --

THE COURT:  Wait.  413.1?

MS. LEDERER:  Yes.

THE COURT:  I don't see that on our list.  Okay.
413.1, and what's the last?

MS. LEDERER:  408.2.  Those were added to the updated
list.

THE COURT:  All right.  You just mentioned, I thought,
with the sergeant 408.

MS. LEDERER:  Yes, 408.1.

THE COURT:  Just point 1?

MS. LEDERER:  Yes.

THE COURT:  You may proceed.

So all of those exhibits are admitted without objection.

(Government Exhibits 408.1, 413.1, and 408.2 received into
evidence.)

MS. LEDERER:  Thank you.  I will also be referring to
411.1 and 410.1, which are already in evidence.

THE COURT:  All right.

BY MS. LEDERER:

Q.   If we could please bring up 408.1 and bring it to four
minutes into the video, please.

Sergeant Lively, is this the Speaker's Lobby?

A.   Yes, it is.

Q.   And if we could play, pausing at 4:21.

(Video played.)

BY MS. LEDERER:

Q.   Sergeant Lively, do you see yourself?

A.   I do.

Q.   Could you circle yourself?

A.   (Witness complied.)

Q.   Indicating for the record the witness circled the officer in the middle of the doors.

And did you see the defendant?

A.   Yes.

Q.   Where is the defendant?

A.   He's right here, wearing this hat.

Q.   If we could press play and pause at 4:44, please.

(Video played.)

BY MS. LEDERER:

Q.   Where was the defendant in the portion of video that we just watched?

A.   He was directly in front of me.

Q.   If we could continue to play and pause at 5:03, please.

(Video played.)

BY MS. LEDERER:

Q.   Sergeant Lively, paused right here at 5:03, what is this area being shown in the video?

A.   This is a stairway that leads up to the Speaker's Lobby

from the first floor of the Capitol.

Q.    This officer that we see coming up, do you recognize that uniform?

A.    Yes.  That's a Capitol Police CERT, which is our SWAT team uniform.

Q.    If we can continue to play, please.

(Video played.)

        BY MS. LEDERER:

Q.    If we could please go to 410.1.  And if we could bring that 14 minutes and 27 seconds in, please.  If we could press play, please.

(Video played.)

        BY MS. LEDERER:

Q.    Press pause, please.  Can you bring it back about two seconds.

        Sergeant Lively, I'm going to circle an object in the defendant's hand.  Can you see what that is?

A.    Yes.  It's a helmet.

Q.    If we can press play all the way through the remainder of this video.

(Video played.)

        BY MS. LEDERER:

Q.    Sergeant Lively, we will get to why you and your fellow officers moved out of the way in a second, but after your fellow officers and you moved, what did the defendant do?

A.   He continued to smash the window with the helmet that he had.

Q.   If we could please bring up 411.1, and if we could start 30 seconds in, please.

Sergeant Lively, looking at 411.1, at this point, are any of the windows smashed?

A.   No.

Q.   If we could play until 1:01, please.

(Video played.)

        BY MS. LEDERER:

Q.   Sergeant Lively, could you hear anyone say anything?

A.   Yes, but I don't know.  I'm sorry.  I wasn't listening that well.  I'm sorry.  Can you replay it?  I'm sorry.

Q.   No, that's fine.  We can bring it back.

A.   Sorry, everybody.

(Video played.)

        BY MS. LEDERER:

Q.   If we could pause right here.  For the record, we are at 38 seconds.

The officer that just kind of went behind this person, who is that?

A.   That's Officer Yetter.

Q.   And who is this officer off to your right?

A.   Officer Lanciano.

Q.   Thank you.  If we can press play, and we will pause at

1:01.

Again, if you could just listen.

(Video played.)

BY MS. LEDERER:

Q.   Could you hear anything?

A.   I believe I heard someone yelling "let me in."  I heard someone yelling "bitch" and "why are you not helping us."

Q.   Did you see any contact of Sergeant Yetter?

A.   I believe the defendant, when he went to strike the window, shoulder checked him.

Q.   If we could continue and pause at 1:11.

(Video played.)

BY MS. LEDERER:

Q.   If we could just do a play/pause real quick.

Sergeant Lively, now looking at the screen, are any of the windows smashed?

A.   Yes.

Q.   At this point in time, do you recall what was going through your head?

A.   I just wanted to stay there as long as it took for the members to get out.

Q.   If we could press play, please.

(Video played.)

BY MS. LEDERER:

Q.   Sergeant Lively, we're paused here at 1:31.  What did the

defendant just do?

A.    Punched the window next to me while making contact with me.

Q.    If we could continue -- as the defendant was punching the window, did you have any concerns -- while he was punching the window and making contact with you, did you have any concerns?

A.    He was the most aggressive one.  If he was able to break the windows, they would be able to get in there while the members were still there.

Q.    When you said yesterday that you specifically remember the defendant, why was that?

A.    He was the loudest, the most aggressive, and he was the one punching the windows.

Q.    If we can continue to play, and we're going to pause at 2:40.

        (Video played.)

            BY MS. LEDERER:

Q.    I'm sorry.  If we could pause here.  For the record, we're paused at 2:11.

        We've seen now three videos of the defendant putting his hands out and saying something.  Do you recall what he said that day?

A.    He was -- at one point told the crowd that we weren't the problem.

Q.    Did you interpret his actions differently?

A.    Yes.  By smashing the window, hitting us with his shoulders

while he smashed the window, his words did not match up with his actions.

Q.   If we can continue to play and pause at 2:40.

(Video played.)

BY MS. LEDERER:

Q.   Sergeant Lively, can you see this object behind this person?

A.   Yes.

Q.   What is that?

A.   It's a type of sign that's attached to a stanchion.

Q.   What direction is that going in?

A.   It's towards us.

Q.   If we could play and then pause at 2:44.

(Video played.)

BY MS. LEDERER:

Q.   Sergeant Lively, earlier, I said we would get to why you and your fellow officers moved.  Can you walk the jury through why you moved out of the way?

A.   So like I said before, we stayed there as long as the members of Congress were evacuating.  If you had seen me previously in the video, I looked behind in the windows, and at that point, the hallway was clear.  I assumed that if the hallway is clear, that all the members of Congress had been evacuated.

At that point, the crowd was getting bigger.  The crowd was

getting more violent, smashing the windows, screaming "fuck the blue," and I made the decision to get the two officers and myself out of the way of the crowd.  There was a stairwell next to us that we could get out.

We just -- there were three of us, a hundred of them, and I made a decision to get them out, even knowing that they could break down the doors.  But with my knowledge that they had gotten all of the members out at that point, we did what we could, and I had to make that decision, and I was the one who ordered the officers to leave.

Q.   And when you moved from that position, who was coming up the steps?

A.   There was a tactical team coming up the stairs.

Q.   That tactical team, were they at that point -- did they have better uniforms than you?

A.   Yes.  They had more protective gear than us.

Q.   At that point, did you even have anything to defend yourself with?

A.   No.  I had exhausted my OC spray, which is pepper spray. Again, I was just physically exhausted after the fight.  I just -- the crowd seemed intent on getting through us.  There were three of us, and we were just in a situation that wasn't going to turn out well.

Q.   If we could continue to play throughout the remainder of Exhibit 411.1.

(Video played.)

BY MS. LEDERER:

Q.   Sergeant Lively, at the time that you moved away, I know that you said that you saw the hallway was clear, but did you have any knowledge of whether or not people were still inside the actual chambers?

A.   I did not.

Q.   If we could please bring up 413.1.  If we can play 413.1, pausing 23 seconds in.

(Video played.)

BY MS. LEDERER:

Q.   Sergeant Lively, as you and your fellow officers are moving out of the way, what is the defendant doing?

A.   Smashing the windows with a helmet.

Q.   If we can continue to play through.

(Video played.)

MS. LEDERER:  Thank you.  Your Honor, if I may have a brief indulgence to discuss something with my co-counsel.

THE COURT:  Sure.

(Government counsel conferred.)

BY MS. LEDERER:

Q.   Sergeant Lively, after the defendant smashes out this last window, do you know if anyone tries to go through?

A.   Yes.  One of the rioters tries to go through.

Q.   Based off that attempt to go through, do you know what

happened to that rioter?

A.   An officer on the other side fires his service weapon, striking her.

Q.   After that, do people still remain in this area?

A.   Yes.

Q.   If we could please bring up 408.2.

Do you see the defendant in 408.2?

A.   I do.

Q.   And where is the defendant?

A.   He's on the stairwell, holding the black helmet on top of his head.

MR. METCALF:  Your Honor, objection as to relevance.

THE COURT:  Let's approach.

(Bench conference.)

MR. METCALF:  If they're going to go and talk about the shooting and then go to after him on the stairs, then that opens up the door to me for everything.

THE COURT:  So why?  What's important about him on the stairs?

MS. LEDERER:  This is literally I'm done.  I just wanted to show that he was still in the area, and then we have the testimony that he leaves shortly after.  We have him on CCTV leaving.

THE COURT:  I mean, I don't think you need this.  I mean, he's done trying to get into the place.

So do you want me to strike this?

MR. METCALF:  I just don't get -- it's still on the screen.

THE COURT:  What's that?

Well, it's been admitted into evidence; right?  You didn't object to it coming in.

MR. METCALF:  I didn't.

THE COURT:  It's in evidence.  You -- move on.  Go back and say no further questions.

MS. LEDERER:  I have one more question about, did the rioters' presence make it difficult for you to do your job that day, and then I'm done.

THE COURT:  Do you really think you need to ask that?

MS. LEDERER:  One more question, did the rioters make it difficult for you to do your job that day?  He is charged with civil disorder --

THE COURT:  I think you've proven that.  I don't think -- let's just sit down.

MS. LEDERER:  Okay.  Thank you, Your Honor.

(End of bench conference.)

MS. LEDERER:  Sergeant Lively, I have no more questions at this time.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  All right.  Mr. Metcalf?

MR. METCALF:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. METCALF:

Q.   Good morning, Sergeant Lively.  How are you today?

A.   I'm good.  Thank you.

Q.   First and foremost, I want to thank you for your service. I heard it in your voice, this matters to you, and I know that was a rough day.  So I'm going to try to be as short and concise as I possibly can.

A.   Okay.

Q.   Isn't it true that when you actually went down the stairs, that was the first time that you saw the CERT officers?  Or what is it?  CR officers?

A.   CERT, C-E-R-T.

Q.   You first saw them as you were already heading down the stairs; is that correct?

A.   Yes.  They were coming down when we were coming up.

Q.   So when you made that decision to leave, you did so prior to seeing those officers; correct?

A.   I made the decision to leave without knowing them, yes.

Q.   The goal was to ensure the safety of who you believed was behind that door; correct?

A.   That's correct.

Q.   And you still chose to remove your officers and yourself from that area; correct?

A.   I did.  They had -- were gone.

Q.   There was a guy standing behind the door with a gun who shot someone, and you didn't know that they were there; correct?

A.   I did not.

Q.   So you mean to tell me that you knew all the other people that were behind that door, if they were gone or not?  You made an assumption; is that correct?

A.   Yes.

Q.   An assumption within seconds of this going on; is that correct?

A.   I looked down the hallway, and the group that had been there was gone, yes.

Q.   Now, as you're standing there, at any point in time -- let's just talk about the scene where you're standing in front of the doors.

     Did you tell anybody to leave?

A.   I don't remember.

Q.   You did not tell anybody to leave; correct?

A.   I don't know if I specifically did, but I told people to stop.  But I was not really engaging in conversation.

Q.   That video that you watched, you saw -- in that video that was just shown to you, you were telling people to stop during that video?  You saw yourself telling people to stop?

          MS. LEDERER:  Your Honor, I'm going to object, not to the form of this question, but I would just ask that Mr. Metcalf let the witness answer.

THE COURT: Agreed. Mr. Metcalf, let him answer the question before you start another.

THE WITNESS: At one point, it looked like my hands went out and I said stop.

BY MR. METCALF:

Q. It looked like your hands went out?

A. Yes, sir.

Q. You remember telling Mr. Alam to stop and leave?

A. I don't remember specifically telling anyone. I think I was telling the crowd.

Q. So as Mr. Alam is by you -- hitting the glass by you, you did not tell him to stop or leave; is that fair to say?

MS. LEDERER: Objection; asked and answered.

THE COURT: Overruled.

THE WITNESS: I can't specifically say I told him to stop when he was doing that.

BY MR. METCALF:

Q. Now, Mr. Alam, when he was -- he never physically punched you; correct?

A. Correct.

MR. METCALF: Your Honor, can I step back and get my water?

THE COURT: Sure.

MR. METCALF: Thank you.

BY MR. METCALF:

Q.   Mr. Alam never physically punched the other two officers; correct?

A.   No, I don't believe so.

Q.   You recall -- obviously, you were interviewed and spoke to other people after this, this day; right?

A.   Yes.

Q.   Do you recall just describing Mr. Alam as the aggressive one and not as an individual who is assaulting you and your fellow officers?  Do you remember stating that?

A.   I stated that he was aggressive --

Q.   Yes.

A.   -- or that he assaulted us?

Q.   That he was aggressive and he was not assaulting you.

A.   I know that he was aggressive.  I don't remember if I said he did not assault me.

Q.   Okay.  Was it your opinion or did you state after this incident that Mr. Alam did not assault you and your fellow officers?  Do you remember stating that?

A.   I had a conversation with people.  I believe I said that his shoulder, when he punched, made contact with me.

Q.   Okay.  So you're sure --

A.   Sir, this is to the best of my knowledge.  I'm not sure if that's what it was.  The video shows that he made contact, but I did not remember it before I was shown the --

Q.   The video shows you moving a little bit.  It does not show

822

Mr. Alam contact you.  Is that fair to say?

A.    I don't know, sir.

Q.    Do you remember speaking with Internal Affairs?

A.    Yes -- MPD's Internal Affairs?

Q.    Yes.

A.    I do.

Q.    And during that interview, do you specifically remember not once, but twice saying that Mr. Alam was aggressive but you were not concerned that he assaulted you and your fellow officers?

A.    I don't remember that conversation.

Q.    Do you remember -- during that interview, did you tell them that Mr. Alam's shoulder hit you?

A.    I don't remember, sir.

Q.    Do you remember telling them, or do you -- let me rephrase.

During that interview, you did not say that Mr. Alam's shoulder hit Officer Yetter's shoulder; is that correct?

A.    I don't believe I was asked about Mr. Yetter.

Q.    So you're standing there with three officers, Mr. Yetter, you, and -- is it sergeant?

A.    Officer Yetter.

Q.    Officer Yetter, you, and Luciano?

A.    Lanciano.

Q.    He's no longer with the department; is that fair to say?

A.    That's correct.

Q.    So you're with Internal Affairs, and you're talking about

that day, you're talking about that incident, and you didn't talk about Officer Yetter?

A.    I don't remember talking about him, no.

Q.    Isn't it true that today's the first time that you have ever said that Mr. Alam's shoulder hit Mr. Yetter?

A.    It's the first time I've been asked that question.

Q.    So it's the first time that you've actually said that; is it fair to say?

A.    Yes.

Q.    And you've been interviewed for hours on this issue.

A.    I was interviewed one time before this for that.

Q.    And that was for over an hour; is that fair to say?

A.    I believe it was 45 minutes.

Q.    And during that interview, you did not say that Mr. Alam, his shoulder hit you; is that correct?

A.    I don't know.  I don't think -- if you're saying so, then I did not.  I don't know.

Q.    Well, Officer, I'm asking you.

A.    Yes.

Q.    Is it true that today is the first time that you have said Mr. Alam's shoulder hit you?

        MS. LEDERER:  Objection; asked and answered.  If Mr. Metcalf wants to refresh the witness's recollection, he's more than welcome to do that.

        MR. METCALF:  Your Honor, my last question was about

Yetter's shoulder.  This is now about his shoulder.

THE COURT:  Overruled.

THE WITNESS:  Then it would be my first time I've said it, yes.

BY MR. METCALF:

Q.   Officer, I'm asking you under oath, at that point in time -- we've all seen the video.  Okay?

A.   Right.

Q.   You've identified Mr. Alam, the windows.  He didn't hit you physically or punch you physically.

A.   He did not punch me, no, sir.

Q.   Did you fear that he was going to punch you?  Under oath, being truthful, as you sit here today, did you believe that he was actually going to hit you?

A.   I don't know, sir.

Q.   How tall are you?

A.   6 foot 5, sir.

Q.   You're obviously taller than him; correct?

A.   Yes.

Q.   And you described his actions not meeting up with his words; right?

A.   Correct.

Q.   And when you described that to the jury, it was actually when Mr. Alam turned around and said "protect these officers"; correct?

A.   He said "these are not the ones" -- "these aren't the ones we have issues with," I believe, something like that.

Q.   So when Mr. Alam turned around and put his arms out, it was in a protective posture for you and your fellow officers; correct?

A.   You can say that.

Q.   And his actions were hitting the window, not any of you or your fellow officers; correct?

A.   He punched the windows and made contact.

Q.   So I will go back.  As we sit here today, did you actually believe that Mr. Alam, based on those actions, hitting next to you, protective movement towards you and your fellow officers, did you actually believe that he was going to assault you or your fellow officers?

          MS. LEDERER:  Objection.

          BY MR. METCALF:

Q.   Yes or no?

          MS. LEDERER:  Objection; asked and answered, also argumentative.

          MR. METCALF:  He didn't actually answer it last time.

          THE COURT:  He said "I don't know," I thought.  But I will allow -- rephrase the question.  One more question relating to this.

          MR. METCALF:  Thank you.

          BY MR. METCALF:

Q.    Officer, did you actually believe that Mr. Alam was going to assault you or your fellow officers?  Yes or no?

A.    I can't speak to his state of mind, sir.  Everyone was aggressive.  They were punching windows.  I can't tell you if I thought he was going to punch.  I can't control his actions.

Q.    Understood.  But based on what you saw, and you saw that he was not hitting you and your fellow officers, did you believe that he was going to hit you and your fellow officers?

        MS. LEDERER:  Objection; asked and answered.

        THE COURT:  Sustained.

        BY MR. METCALF:

Q.    The CDU platoon, can you describe what that is for me?

A.    Sure.  Civil Disturbance Unit.  It's activated for any type of demonstration or protest.  You can be in uniform of the day, which is the uniform that I would be wearing, or they could order us to put on hard gear.

Q.    And that day, you started off, you said, with the uniform that you're wearing now; right?

A.    That's correct.

Q.    Now, you also said after the event that you were not given advanced time to put your gear on and were left to fight without protective gear; is that correct?

A.    That is correct.

Q.    You said, "The decisionmaking resulted in numerous injuries to officers and did not allow us to have our full resources."

Do you remember stating that?  Yes or no?

A.    I don't remember stating it, but it's true.

Q.    Thank you.  Do you remember stating --

MS. LEDERER:  Your Honor, I'm going to object at this time.  This is improper impeachment.  The question can be formed in a different way.

MR. METCALF:  I can reform it.  That's fine.

THE COURT:  All right.  Rephrase the question.

BY MR. METCALF:

Q.    Officer, do you believe that there was a lack of communication and direction on the radio during that day, January 6?  Yes or no?

MS. LEDERER:  Objection; relevancy.

THE COURT:  Sustained.

BY MR. METCALF:

Q.    Officer, isn't it true that you were upset, very upset about the circumstances surrounding that day with regards to your own department or the CDU?  Yes or no?

MS. LEDERER:  Objection; relevancy.

THE COURT:  Sustained.

BY MR. METCALF:

Q.    Do you believe that you were put into a situation that you couldn't handle?  Yes or no?

MS. LEDERER:  Objection; relevancy.

THE COURT:  Sustained.

828

BY MR. METCALF:

Q.   Officer, as you -- the stairway that you went down, how far would you say that that was from the doors that you were standing at?

A.   10, 15 feet down.

Q.   And did you ever tell anybody -- anyone who you thought was a protestor that day, did you ever tell them to evacuate down those stairs?  Yes or no?

A.   No.

Q.   Did you ever tell Mr. Alam "go down those stairs"?

A.   No.

Q.   So when you made the decision to leave, you did so not knowing who was on the other side, and you did so while this was all occurring; correct?

A.   Yes.

Q.   And you did so without telling anybody to leave or where they should leave from when there's a stairway clearly right there; correct?

A.   Yes.

        MR. METCALF:  Thank you again, Officer, for your service.

        THE COURT:  All right.  Ms. Lederer?

        MR. METCALF:  Nothing further.

                    REDIRECT EXAMINATION

        BY MS. LEDERER:

Q.   Good morning, Sergeant.

A.   Good morning.

Q.   I know the defendant was not punching you, he was punching the glass.  While he was punching the glass, did he make contact with you?

A.   Yes.

Q.   Did you know what the defendant was going to do next every time he did something?

A.   No.

Q.   Did you know what anyone else in that hallway was going to do next?

A.   No.

Q.   Did everyone in that hallway affect your ability to do your job that day?

A.   Yes.

        MR. METCALF:  Objection.

        THE COURT:  Overruled.

        THE WITNESS:  Yes.

        BY MS. LEDERER:

Q.   Were you concerned for your safety that day?

A.   Yes.

Q.   Why?

A.   There were three of us, 50 to 100 protestors screaming "fuck the blue," "we're coming through."  I had my back to a wall or to doors that were barricaded.

MS. LEDERER:  I have nothing further.  Thank you.

THE COURT:  All right.

MR. METCALF:  One quick question, Your Honor?

THE COURT:  Is it a follow-up?

MR. METCALF:  Yes.

RECROSS-EXAMINATION

BY MR. METCALF:

Q.   Isn't it true Mr. Alam never said to you "fuck the blue"?
Isn't that accurate?

A.   I don't know that.

MR. METCALF:  Thank you.

THE COURT:  Can this witness be excused?

MR. METCALF:  Yes, Your Honor.

THE COURT:  Thank you, sir.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Can the government call its next witness?

Oh, wait.  Let's take a break now, a short break.

(Jury exited courtroom.)

THE COURT:  All right.  I realized it was a little
early after I said it, but a couple of jurors were nodding
vigorously.  So I do think they need a bathroom break.

We will just take ten, 15 minutes by the time they get
back.  I say ten minutes, but you all should understand it's
closer to 15, given the number of bathrooms back there.

Who is the next witness?

MR. SMITH:  It would be Special Agent Kyle Yetter, who was a Capitol Police officer, the one on the left --

MR. METCALF:  I thought you guys were going with Armor?

MS. LEDERER:  That was just my list of exhibits.

MR. METCALF:  Your Honor, I thought that they were going with a different witness.  So if this witness concludes, I need a little bit --

THE COURT:  How long do you expect this witness to be?

MR. SMITH:  Our witness?

THE COURT:  This time, I need a better prediction.

MR. SMITH:  For fear of being off of my estimate, it will not be as long as Sergeant Lively.  We will play some of the same videos, but we understand the Court wants the testimony directly to that area.  So I would spend two minutes talking about, you know, getting him there and then play three exhibits that have all three been admitted in evidence already.

THE COURT:  Is the government's next witness available now?

MS. LEDERER:  Your Honor, I'll have to -- Yetter is --

THE COURT:  Is the next witness available?

MS. LEDERER:  We haven't had a chance to step out and see if Special Agent Armor is here.

So what has happened is, I wrote down all my witnesses --

THE COURT:  No, I understand.  It's a lack of

832

communication --

MS. LEDERER:  We would prefer to go in chronological order.

THE COURT:  I understand.  It just means we may need to break early for lunch, and I'm just trying to use the time as best we can.

Is there any other witness --

MR. SMITH:  Your Honor, if we take a recess right now, we can go out and check --

THE COURT:  Go out and check, and if you can't call another witness, then, Mr. Metcalf, I'll give you -- we will stop early for lunch.

MR. METCALF:  Thank you, Your Honor.

MS. LEDERER:  Your Honor, Special Agent Armor is trying to find parking right now.  There's no guarantee he will be in by the time --

THE COURT:  If he is close and you all are ready to go, we can wait five minutes for him to get in the building.

MS. LEDERER:  We'll make it work.  Thank you, Your Honor.

THE COURT:  Mr. Metcalf, the deal is if we break early for lunch so you can have time to prepare, you also need to eat so you can make it through the end of the day.  So you have to figure that out.

MR. METCALF:  I will, Your Honor.

(Recess taken from 10:56 a.m. to 11:12 a.m.)

(Jury not present.)

THE COURT:  One other issue for the government, on this receipt, clearly, you want the receipt to argue that he bought these burner phones after January 6; right?  That's for the truth of the matter.

And looking at the cases on the residual hearsay exception, I don't think it fits.  If you've got cases that show the contrary, okay, but what I really think you need in order to admit that is a certification from Walmart.

MR. SMITH:  I guess our --

THE COURT:  If -- if you're admitting it for the truth, which it doesn't have any relevance if you're not.

MR. SMITH:  What we're admitting it for is the truth of the matter asserted that he purchased the phones, and then the fact that he actually -- the testimony that there was a phone in his possession other than his iPhone.

And then we would infer from that that he purchased a second phone --

THE COURT:  That sounds like you're introducing it for the truth of the matter.

MR. SMITH:  We certainly have an ultimate reason why we want to offer it, and that is to argue by inference that it was a second phone that he could use.

The receipt itself is just being offered to prove that he

purchased the phone, not the reason why he purchased it.  So we think that it's limited as far as the hearsay exception.

THE COURT:  But that's the truth of the receipt.

Ms. Lederer, what I said is, looking at the case law and the residual hearsay exception, I don't think this fits, but if you've got a case that -- you've got authority that shows otherwise, of course I will entertain it.

I think what you all need is a certification from Walmart.

MS. LEDERER:  I will absolutely look into that over lunch.

The only thing is, it's not like the receipt says this is a burner phone to be used when you want to get away.  The receipt just says --

THE COURT:  But its only relevance is the fact that he -- it was found on his person; right?  But just the piece of paper being found on his person does nothing for the government's case; right?

It's the fact that --

MS. LEDERER:  It's just proof of purchase, and then we make an argument and an inference --

THE COURT:  But that's -- that's that this is a receipt from Walmart.  That is this is what it purports to be, he bought this from Walmart.

MS. LEDERER:  But then the inference we're making later is it's a burner phone.  So it's two separate things.

We're just making an inference off of -- like someone saying -- you're in an argument with a friend -- not you.  In general, someone's in an argument with a friend, and you say, "I want to kill you," and you come back later with a gun and kill the person.  At court -- in court during trial, the defense attorney can say, well, that's not what they meant, that's a turn of phrase --

THE COURT:  But the phrase comes in because -- that's an admission in your example of the defendant.

MS. LEDERER:  Right.  That's not a perfect example.

THE COURT:  This needs to meet -- it needs to be admissible.

MS. LEDERER:  Right, and it is, because it's just literally a phone purchase.  So it has the indicia of reliability because it's a receipt, and we get to make an inference later.  It's not like the receipt says -- for the truth of the matter asserted would be that it is a burner phone.  So it's not saying that on the receipt.  We're just making that inference later.

THE COURT:  What I'm telling you is, when you say it has indicia of reliability, this is like the residual hearsay exception.  And what I'm telling you is that those cases tend to apply -- that this exception tends to apply in situations where the business record exception is not quite met.

You don't have anything to meet the business record

exception at this point.

MS. LEDERER: I guess the receipt is the business record, but I know it's not the signed business record from a custodian, but it is --

THE COURT: You don't have any of those four prongs of the business record exception met. Nothing.

So again, if you can show me a case that proves otherwise -- I don't think the inference that you're seeking to draw is the problem. I think it's how do you get this into evidence. Yes, it's on his person, but I wouldn't let you admit into evidence something that was potentially prejudicial and not relevant to this case, and the relevance to this case is to tie it to these phones.

And is he even contesting that these phones were in his room?

MS. LEDERER: No, I don't know what defense wants to do.

MR. METCALF: I did object to these receipts --

THE COURT: No, the receipts. But the fact -- are you going to object that these phones were seized from his room? He's in possession of these phones.

MR. METCALF: Yes, there are pictures of them as well on the end tables from my recollection, but --

THE COURT: Well, if you're --

MR. METCALF: I just don't see the relevance of --

THE COURT:  Of the phones?

MR. METCALF:  -- bringing them up, yes.

THE COURT:  I see the relevance of the phones, absolutely.  If they're burner phones rather than his own regular phone, for sure.  And presumably, someone's going to testify, has knowledge of what kind of phone this is.

MS. LEDERER:  Yeah.

THE COURT:  It's a phone that you buy -- burner phones have -- they're more temporary -- what?

MS. LEDERER:  I said less frills.  When you said burner phones and you paused, I said less frills.

THE COURT:  Anyway, that's where I stand.

If you want to show me authority to the contrary, I will reconsider.  But I really think if you want to get this in, you need a certification from Walmart.

MS. LEDERER:  And I will look into it over lunch, and if I have nothing, we will address that, and if I do, great, and will make an additional argument.

Thank you.

MR. METCALF:  Your Honor, I wanted to ensure the Court, I brought in a dear colleague of mine, Norm Pattis, to make sure that I will eat lunch during the lunch break.

MR. PATTIS:  I've known Mr. Metcalf for a while, and without lunch, he's impossible to bear.

THE COURT:  For sure.  He's impossible to bear with

lunch. No, I'm kidding. We have short time. So if you can help him get some food, that's great. Thank you.

All right. Are we ready to bring in the jury?

MR. SMITH: The government is, Your Honor.

MR. METCALF: Your Honor, real quick before we do, they're going to stick with the officer. So I ask that we break after his direct is completed.

THE COURT: I understand. All right.

And then this afternoon -- so we have the government's order of witnesses?

MR. SMITH: Yes, Your Honor.

THE COURT: What comes this afternoon?

MR. SMITH: This morning, the last witness this morning, we anticipate, will be FBI Special Agent Kyle Yetter, who was a Capitol Police officer at the time.

THE COURT: Okay.

MR. SMITH: And then in the afternoon, it would be Special Agent Patrick Armor and Special Agent Rosemaria Marketos, our case agent.

THE COURT: And the government will rest except this issue with the --

MR. SMITH: Yes, Your Honor, as far as Mr. McIntyre, if Your Honor will let us conditionally rest, or if the defense is going to start their case Monday, we would ask permission to either reopen or not formally rest our case until Monday

morning.

He is a witness who, I believe very conservatively, the most time he would take is half an hour with direct and cross.

THE COURT:  I know.  We need time.  I've got other case hearings, other matters next week.  It depends when we end.  If it's 4:30, fine.  If it's 3:30, we're going to keep going, Mr. Metcalf.  So I hope you're ready.

MR. METCALF:  If the people -- I mean, if the government rests today at 3:30, I would not be in a position to present my case.

THE COURT:  Why not?

MR. METCALF:  Because I have the officers I've subpoenaed.  I have not been able --

THE COURT:  No, of course, but you can open.  You can do your opening.

MR. METCALF:  Yeah.

THE COURT:  And we can talk about the officers and what your theory is, your good-faith basis for calling them.

MR. METCALF:  Yes.

THE COURT:  And -- so I'm just saying, we're not going to stop today at 3:00, 3:30.  We're going to go later.  If it's more like 4:30, maybe we stop and let the government call one witness Monday morning.  But we've got to keep moving and use our time.

And do not slow walk this because both of you want to get

to Monday.  All right?

MR. SMITH:  Your Honor, I would not do that.

THE COURT:  I will recognize, like, asked and answered questions.

Let's bring in the jury.

(Jury entered courtroom.)

THE COURT:  Welcome back, ladies and gentlemen.

Mr. Smith?

MR. SMITH:  Yes, Your Honor.  At this time, the government would call FBI Special Agent Kyle Yetter as a witness.

KYLE YETTER, WITNESS FOR THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MR. SMITH:

Q.   Good morning, sir.

A.   Good morning.

Q.   Can you please say your name and spell your last name for the jury.

A.   My name is Kyle Yetter, Y-e-t-t-e-r.

Q.   And if you could please let the jury know how you're employed.

A.   I'm currently a special agent with the FBI, assigned to the Baltimore Field Office.

Q.   And how long have you been a special agent with the FBI?

A.   Just over one year.

Q.   Prior to that, did you have any experience in law enforcement?

A.   Yes, sir, I did.

Q.   Okay.  Can you explain that?

A.   I was -- prior to the FBI, I was with United States Capitol Police for about five years.

Q.   Approximately when did you start with Capitol Police?

A.   Around December 2017, I believe.

Q.   And then when did you leave Capitol Police for the FBI?

A.   July of last year.

Q.   So July 2022?

A.   Yes, sir.

Q.   So you were employed as a Capitol Police officer on January 6 of 2021; correct?

A.   Yes, sir, that's correct.

Q.   On that day, were you assigned to work at the Capitol or near the Capitol?

A.   Yes.  I was assigned to work near the Capitol building that day.

Q.   Okay.  What unit or section were you in at that time?

A.   At that time, I was assigned to House Division Section 3.

Q.   Was your area of responsibility the Capitol building itself or one of the auxiliary buildings?

A.   My area of responsibility was south of the Capitol, being the Rayburn, Longworth, and Cannon building.

842

MR. METCALF:  Your Honor, I just ask that the questions be phrased in a way that's not leading so I don't have to object.

THE COURT:  I will allow it for this background information, but I expect Mr. Smith won't continue that when we get beyond the background.

MR. SMITH:  Yes, Your Honor.

BY MR. SMITH:

Q.   Were you scheduled to work on the 6th?

A.   Yes, I was.

Q.   And what time did you report for work, if you remember?

A.   I was scheduled to report at 3:00 p.m.

Q.   Do you arrive at 3:00 p.m.?

A.   No, sir.  I arrived much earlier, around 1:30, 2:00.

Q.   And when you arrived there, I believe you said you would normally be at one of the House office buildings.

Is that where you established your post?

A.   I did not end up establishing my post on January 6.

Q.   And what did you do instead?

A.   Upon arriving to the Longworth building, where the House Division Section 3 officers will change over and report to post, the Capitol building had since been already overrun with rioters, in which I changed over really quick and responded to the nearest official, and I said, Where do I go?  And he said, Grab as many officers as you can and respond to the Capitol

building to help.

Q.    And is that what you did thereafter?

A.    Yes, sir.

Q.    All right.  Now, I want to focus your attention on a specific area -- just briefly, where was the first area you went to?

A.    The first area I went upon going to the Capitol building with a handful of other officers was the Memorial Door area of the Capitol building.

Q.    And then after spending time there, where did you go next?

A.    After leaving the Memorial Door building, I responded to the House Speaker's Lobby door.

Q.    The House Speaker's Lobby door, was there anyone else that responded with you to that location, or were you by yourself?

A.    Upon going up to the Speaker's Lobby door, I was with Officer Lanciano.

Q.    The Speaker's Lobby door, was there anybody else there, any other law enforcement personnel there?

A.    Yes.  Once Officer Lanciano and I responded to the door, we also met with Sergeant Lively.

Q.    I forgot to ask you this earlier.  You said you changed over quickly.  What sort of uniform were you wearing on that day when you were at the Speaker's Lobby door?

A.    Typical uniform.  I was wearing a bulletproof vest, duty gear, such as a handgun, magazine, pepper spray, baton.  And

then I had a jacket over as well, marked uniform jacket.

Q.    If you can describe for the jury what the scene was at the Speaker's Lobby door when you arrived there with Officer Lanciano.

A.    When we first arrived to the door, on the other end of the door, it appeared to be barricaded with chairs.  And then quickly -- it was a pretty empty hallway that soon overflowed with rioters and protestors.

Q.    Now, when you approached the Speaker's Lobby doors -- there's been testimony there was glass in the doors.  Could you see through the glass into the Speaker's Lobby itself?

A.    Yes.

Q.    What, if anything, did you see there?

A.    The -- I saw the barricaded, like, chairs and stuff behind the door.

Q.    Did you see any individuals behind the door?

A.    At the time of responding to the door, I didn't take too long to stare into the doorway.  I immediately turned around and started a police line.

Q.    This police line, how many officers were on it?

A.    Just myself and two others.

Q.    At this time, if we can pull up Government's Exhibit 411.1, which has been previously admitted into evidence, and if we can cue it to 29 seconds in, and if we can play it.

        (Video played.)

BY MR. SMITH:

Q.   Special Agent Yetter, do you see yourself in that video?

A.   Yes, I do.

Q.   For purposes of the record, the video stopped at approximately 38 seconds.

Where in that video, that line of three officers when you're looking at the three officers, which one is you?

A.   From left to right on the screen, it would be myself, Sergeant Lively in the middle, and Officer Lanciano to the right.

Q.   And then are you visible, or are you obscured by anything in this freeze frame?

A.   This frame, I'm obscured by the red hat.

Q.   Now, at this time, was this -- how long after you got to the Speaker's Lobby, if you can estimate, was this scene?

A.   I would estimate less than a minute.

Q.   And from your perceptions that day, what was the mood or what was the -- of the room there at that point?

A.   The mood of the whole day and the hallway is just chaos and craziness.  I don't know how else to describe it.

Q.   And if we can please continue to play and then stop at 48 seconds.

(Video played.)

BY MR. SMITH:

Q.   Okay.  At this point, we stopped at 49 seconds in.

Do you remember what was happening at that point?

A.   At this point, that hallway just kept overflowing with more protestors.

Q.   And at that point, I think -- would anything draw your attention during that period of time?

A.   People yelling and screaming.

Q.   Now, in the photograph -- or in the video, it appears your uniform is -- there's some sort of chalk or dust on it.

Do you know what that was, that appearance?

A.   Yes.  That is from a fire extinguisher.  When I was responding at the Memorial Door earlier that day, I was sprayed directly in the face by one of the rioters --

MR. METCALF:  Objection as to relevance.

THE COURT:  Sustained.  I will strike the answer after "yes, this is from a fire extinguisher."

BY MR. SMITH:

Q.   Now, if we can advance to 1:18 on the video.  Now, before we play this video, is this the Speaker's Lobby also?

A.   Yes, sir, it is.

Q.   If we can play to 1:21.

(Video played.)

BY MR. SMITH:

Q.   Officer -- Special Agent Yetter, at this point, do you see the individual with the fur hat and the backpack?

A.   Yes, I do.

Q.   Do you remember that individual that day?

A.   Oh, yeah.

Q.   Do you remember your interactions with him that day?

A.   Yes, I do.

Q.   In this video, as he approaches, does he make any contact with you?

MR. METCALF:  Objection as to form.

THE COURT:  Sustained.

BY MR. SMITH:

Q.   In the last three seconds, did you identify anything that he did, if you could tell the jury?

A.   He pushed me, and he's getting ready to punch the glass door right by my face.

Q.   If we could continue to play until 1:50.

(Video played.)

BY MR. SMITH:

Q.   Special Agent Yetter, can you please explain what was going on at that point and the particular actions of the man in the fur hat and the others?

A.   So the -- the gentleman in the fur hat kept punching the glass doors, screaming at the officers.  I remember vividly that he was the most loud and memorable of that day.

Q.   At that point, what was your state of mind?

A.   At this point, as a law enforcement officer, you're trying to go through and process and trying to solve little problems at

a time, so constantly going through the equation of what's next, what's next, what do I need to do.  So it's constantly running through your head of what you need to do next.

Q.   And what was your goal, your mission, at this point in the video?

A.   So from my understanding, this is still a small police line to prevent these rioters and protestors from advancing.

Q.   At any point during this interaction, either before this video played or all the way through when the crowd was dispersed, did you tell people that it was all right for them to be there?

A.   No.

Q.   Did you -- at this point -- at some point during this interaction, did you actually move away from the doors?

A.   Yes, we did.

Q.   And do you remember why you moved?

A.   Once the hallway began to continue to be overcrowded with people, Sergeant Lively -- based on a conversation we had together between me and Sergeant Lively, that there was a CERT team on the stairs and that we would advance down the stairs. My impression was the CERT team would augment our position.

Q.   And who was the senior Capitol Police officer there on that three-person line?

A.   Sergeant Lively.

Q.   If we can now continue playing until 2:44.

849

(Video played.)

                BY MR. SMITH:

Q.   And when you moved away from the door, Officer Yetter --
Special Agent Yetter, where did you go from there?

A.   We made it to the -- I guess it's a two-step stairwell, and
we got to like the bottom part of the stairs.

Q.   At this point, if we can continue to play.

        (Video played.)

                BY MR. SMITH:

Q.   Special Agent Yetter, you mentioned earlier going down the
stairs.  Did you do that immediately, or did you stay for a
period of time on the side?

A.   No, we stayed for a period of time.

Q.   Did you see yourself in that video along with the others?

A.   Yes, sir, I did.

Q.   And do you have a memory of the man who was in the fur hat
taking the hat off?

A.   I don't remember him taking a hat off.

Q.   At this point, if we can pull up Government Exhibit 410.1,
which has been previously admitted into evidence.  If we can
start at 14:01 or cue it to that.

        (Video played.)

                BY MR. SMITH:

Q.   Now, at this point, this is obviously before you moved to
the side?

A.   Yes, sir, that's correct.

Q.   And what were you doing at that point before you moved?

A.   We were still maintaining the police line.

Q.   Continue to 15:26.

(Video played.)

BY MR. SMITH:

Q.   Special Agent Yetter, you had mentioned earlier that you remembered the man in the fur hat distinctly.

A.   Yes.

Q.   And why so distinctly him?

A.   As crazy as that day was, that was the most loud and boisterous and aggressive person, and he obviously punched right next to my face.

Q.   If we can continue to 15:42.

(Video played.)

BY MR. SMITH:

Q.   So Special Agent Yetter, at the time the helmet is being used to smash the doors, where are you located generally?

A.   On the right wall of the door.

Q.   You hadn't yet gone down the stairs?

A.   Yes; that's correct.

Q.   If we can now pull up Government Exhibit 408.1 and cue it to 3:53.  If we can play the video at this point.

(Video played.)

BY MR. SMITH:

Q.    We're paused at 4:49.

Did you see the defendant saying that "these guys are not the problem"?

A.    Yes.

Q.    Did him saying those words, did that reassure you in any way?

A.    No.  And throughout the day, we heard, you know --

MR. METCALF:  Objection; nonresponsive, move to strike "throughout the day."

THE COURT:  Sustained.  The answer is "no" and strike the rest of the sentence.

BY MR. SMITH:

Q.    We can continue playing.

(Video played.)

BY MR. SMITH:

Q.    Hitting pause at 5:04.

You mentioned earlier a tactical team.  Is this the stairway you were talking about that you moved down eventually?

A.    Yes, sir, it is.

Q.    At this point, there are two individuals in view.  Is that the tactical team you were talking about?

A.    Yes, sir.  I believe there's more as well.

Q.    More in frame or more that are behind them?

A.    More that are behind them.

Q.    We can continue to play the video.

(Video played.)

BY MR. SMITH:

Q.   Paused at 5:30.

From this video, can you tell when the tactical team arrived, whether it was when you were still at the doors when you saw them or when you were already on the side?

A.   The tactical team arrived when we were already on the side of the door.

Q.   Okay.  If you can continue playing to the end of the video.

(Video played.)

BY MR. SMITH:

Q.   Special Agent Yetter, at any point during that period at the Speaker's Lobby did you feel that you were in a safe situation?

A.   No.

Q.   At any point during your time there, did you or any of the officers, to your knowledge, tell the rioters it was okay for them to be there?

A.   No, we never said it was okay to be there.

Q.   Through your time at the Speaker's Lobby, did the situation escalate, or did it de-escalate, or did it just stay the same?

MR. METCALF:  Objection as to form.

THE COURT:  Overruled.

THE WITNESS:  It constantly escalated.  At the time when we moved down, the rioters and protestors started passing

up things to get through to the door.

BY MR. SMITH:

Q.   And did the actions of the defendant in this case affect your ability to perform your job?

A.   Yes.

MR. METCALF:  Objection.

THE COURT:  Overruled.

MR. SMITH:  No further questions, Your Honor.

THE COURT:  Is that all for the direct?

All right.  Ladies and gentlemen, for scheduling reasons, we're going to take our lunch recess now, a little bit early, and bring you back at 1:00 -- wait, 12:50.  All right?  It might be helpful to get in front of the line downstairs also.

All right?  So we will see you back here at 12:50.

(Jury exited courtroom.)

THE COURT:  All right.  Agent Yetter, we will have you resume your testimony after lunch, and don't talk to anyone about your testimony in the interim.

All right?

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Sure.

You all can sit.  Any other issues we need to talk about?

MR. METCALF:  No, Your Honor.  I think we've covered everything.

THE COURT:  Thank you for the brief direct.

MS. LEDERER:  No issues at this time.  We're going to show at some point over lunch the physical evidence to Mr. Metcalf, and also, we can wait until right before -- or we can do it right now, if Mr. Alam wants to be there to also see it, and if any issue arises at that point, I will let you know.

THE COURT:  See the exhibits you're showing?

MS. LEDERER:  Physical exhibits.

THE COURT:  Why don't you all do that now, and if --

MR. SMITH:  Your Honor, regarding the notebook, over the lunch hour, we're also going to pare down to the absolute minimum and see if further redactions need to be made.  Because we're not going to introduce the entire notebook, we will probably do a sub-exhibit, but we will make sure --

THE COURT:  That's fine; that's fine.  And to the extent you need to have me resolve anything, just let me know.

All right?  Okay.  Thank you, all.

(Recess taken at 11:50 a.m.)

(Afternoon session reported by Timothy Miller and bound under separate cover.)

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.



/s/ Sara A. Wick                    September 8, 2023
SIGNATURE OF COURT REPORTER          DATE

| **'** | **3** | **6** | 836:10 | **answer** [8] - 805:20, |
|---|---|---|---|---|

**'this** [1] - 805:23

**3** [2] - 841:21, 842:21
**30** [1] - 810:3
**333** [1] - 797:21
**38** [2] - 810:18, 845:5
**3:00** [3] - 839:21, 842:12, 842:13
**3:30** [3] - 839:6, 839:9, 839:21
**3:53** [1] - 850:23

**6** [6] - 804:20, 824:17, 827:12, 833:5, 841:14, 842:18
**601** [1] - 797:14
**6th** [1] - 842:9

**admitted** [7] - 804:11, 805:1, 807:15, 817:5, 831:17, 844:23, 849:20
**admitting** [3] - 802:16, 833:12, 833:14
**advance** [2] - 846:17, 848:20
**advanced** [1] - 826:21
**advancing** [1] - 848:7
**Affairs** [3] - 822:3, 822:4, 822:25
**affect** [2] - 829:13, 853:3
**Afternoon** [1] - 854:18
**afternoon** [3] - 838:9, 838:12, 838:17
**Agent** [15] - 831:1, 831:23, 832:14, 838:14, 838:18, 840:10, 845:2, 846:23, 847:17, 849:4, 849:10, 850:7, 850:17, 852:12
**agent** [5] - 799:11, 838:19, 840:22, 840:24, 853:16
**aggressive** [9] - 812:6, 812:11, 821:7, 821:10, 821:13, 821:14, 822:8, 826:4, 850:12
**agree** [1] - 802:3
**agreed** [1] - 820:1
**agreement** [1] - 806:21
**ahead** [1] - 803:1
**aided** [1] - 797:25
**ALAM** [1] - 797:6
**Alam** [21] - 799:5, 799:13, 799:18, 800:4, 820:8, 820:11, 820:18, 821:1, 821:7, 821:17, 822:1, 822:8, 823:14, 824:9, 824:24, 825:3, 825:11, 826:1, 828:10, 830:8, 854:4
**Alam's** [4] - 822:12, 822:15, 823:5, 823:21
**allow** [3] - 825:22, 826:25, 842:4
**AMERICA** [1] - 797:3
**America** [1] - 799:5
**angry** [1] - 804:6

**answer** [8] - 805:20, 805:23, 819:25, 820:1, 825:20, 846:14, 851:10
**answered** [5] - 820:13, 823:22, 825:18, 826:9, 840:3
**anticipate** [1] - 838:14
**anyway** [2] - 802:10, 837:12
**appearance** [1] - 846:9
**APPEARANCES** [1] - 797:12
**appeared** [2] - 803:18, 844:6
**apply** [2] - 835:23
**approach** [2] - 799:6, 816:13
**approached** [1] - 844:9
**approaches** [1] - 847:5
**area** [13] - 804:13, 804:15, 808:24, 816:4, 816:21, 818:24, 831:15, 841:22, 841:24, 843:5, 843:7, 843:8
**argue** [2] - 833:4, 833:23
**argument** [4] - 834:20, 835:2, 835:3, 837:18
**argumentative** [1] - 825:19
**arises** [1] - 854:5
**Armor** [4] - 831:4, 831:23, 832:14, 838:18
**arms** [1] - 825:3
**arrive** [1] - 842:13
**arrived** [8] - 803:13, 803:15, 842:14, 842:15, 844:3, 844:5, 852:5, 852:7
**arriving** [1] - 842:20
**articulate** [1] - 801:22
**aspiration** [1] - 801:24
**assault** [4] - 821:15, 821:17, 825:13, 826:2
**assaulted** [2] - 821:12, 822:9
**assaulting** [2] - 821:8, 821:13
**asserted** [2] - 833:15, 835:17
**assigned** [4] - 840:22, 841:16, 841:18, 841:21

| **/** | **4** |
|---|---|

**/s** [1] - 855:8

**4** [1] - 797:9
**408** [2] - 806:16, 807:10
**408.1** [7] - 798:9, 806:16, 807:1, 807:11, 807:16, 807:22, 850:22
**408.2** [5] - 807:1, 807:7, 807:16, 816:6, 816:7
**408.2.....................** [1] - 798:9
**409** [8] - 804:10, 804:13, 804:15, 804:23, 805:1, 805:2, 805:9, 806:11
**409...........................
...........** [1] - 798:9
**410.1** [3] - 807:19, 809:9, 849:19
**411.1** [5] - 807:19, 810:3, 810:5, 814:25, 844:22
**413.1** [7] - 798:9, 807:1, 807:3, 807:6, 807:16, 815:8
**45** [1] - 823:13
**4704-B** [1] - 797:22
**48** [1] - 845:21
**49** [2] - 805:9, 845:25
**4:21** [1] - 808:1
**4:30** [2] - 839:6, 839:22
**4:44** [1] - 808:14
**4:49** [1] - 851:1

| **1** |
|---|

**1** [1] - 807:12
**10** [1] - 828:5
**100** [1] - 829:23
**10016** [1] - 797:20
**10:05** [1] - 797:6
**10:56** [1] - 833:1
**11:12** [1] - 833:1
**11:50** [1] - 854:17
**12:50** [2] - 853:12, 853:14
**14** [1] - 809:10
**14:01** [1] - 849:21
**15** [3] - 828:5, 830:22, 830:24
**15:26** [1] - 850:4
**15:42** [1] - 850:14
**1:00** [1] - 853:12
**1:01** [2] - 810:8, 811:1
**1:11** [1] - 811:11
**1:18** [1] - 846:17
**1:21** [1] - 846:20
**1:30** [1] - 842:14
**1:31** [1] - 811:25
**1:50** [1] - 847:14

| **8** |
|---|

**8** [2] - 797:6, 855:8
**803** [1] - 798:3
**805** [1] - 798:9
**807** [1] - 798:9
**818** [1] - 798:3
**828** [1] - 798:4
**830** [1] - 798:4
**840** [1] - 798:6
**880** [1] - 797:16
**8:15** [1] - 799:18

| **9** |
|---|

**92101** [1] - 797:17
**99** [1] - 797:19

| **A** |
|---|

**a.m** [4] - 797:6, 833:1, 854:17
**ability** [2] - 829:13, 853:4
**able** [4] - 799:19, 812:6, 812:7, 839:13
**above-entitled** [1] - 855:5
**absolute** [1] - 854:10
**absolutely** [3] - 801:11, 834:9, 837:4
**accurate** [1] - 830:9
**Action** [1] - 799:5
**actions** [8] - 812:24, 813:2, 824:20, 825:7, 825:11, 826:5, 847:18, 853:3
**activated** [1] - 826:13
**actual** [1] - 815:6
**added** [1] - 807:7
**addition** [2] - 805:18, 806:5
**additional** [2] - 802:20, 837:18
**address** [5] - 799:24, 800:20, 801:8, 802:10, 837:17
**admissible** [1] - 835:12
**admission** [1] - 835:9
**admit** [4] - 804:12, 804:23, 833:10,

| **2** |
|---|

**20** [1] - 806:11
**20001** [1] - 797:22
**2017** [1] - 841:8
**202-354-3284** [1] - 797:23
**2021** [1] - 841:14
**2022** [1] - 841:11
**2023** [2] - 797:6, 855:8
**20579** [1] - 797:14
**21-190** [1] - 799:5
**21-cr-190** [1] - 797:3
**23** [1] - 815:9
**27** [1] - 809:10
**29** [1] - 844:24
**2:00** [1] - 842:14
**2:11** [1] - 812:18
**2:40** [2] - 812:14, 813:3
**2:44** [2] - 813:13, 848:25

| **5** |
|---|

**5** [1] - 824:17
**50** [1] - 829:23
**5:03** [2] - 808:20, 808:23
**5:04** [1] - 851:16
**5:30** [1] - 852:3

**assumed** [1] - 813:22
**assumption** [2] - 819:6, 819:8
**attached** [1] - 813:10
**attempt** [1] - 815:25
**attention** [2] - 843:4, 846:5
**attorney** [1] - 835:5
**Attorney's** [2] - 797:13, 797:16
**augment** [1] - 848:21
**AUSA** [2] - 797:13, 797:15
**authority** [2] - 834:6, 837:13
**auxiliary** [1] - 841:23
**available** [2] - 831:18, 831:21
**Avenue** [2] - 797:19, 797:21

## B

**background** [2] - 842:4, 842:6
**backpack** [1] - 846:24
**bags** [1] - 800:5
**Baltimore** [1] - 840:23
**barricaded** [4] - 803:17, 829:25, 844:6, 844:14
**based** [5] - 801:25, 815:25, 825:11, 826:6, 848:18
**basis** [1] - 839:18
**bathroom** [1] - 830:21
**bathrooms** [1] - 830:24
**baton** [1] - 843:25
**bear** [2] - 837:24, 837:25
**BEFORE** [2] - 797:1, 797:10
**began** [1] - 848:17
**behind** [13] - 803:16, 805:17, 806:3, 810:20, 813:6, 813:21, 818:21, 819:1, 819:5, 844:14, 844:16, 851:23, 851:24
**Bench** [1] - 816:14
**bench** [1] - 817:20
**best** [2] - 821:22, 832:6
**better** [2] - 814:15, 831:11
**between** [1] - 848:19
**beyond** [2] - 804:4, 842:6

**bigger** [1] - 813:25
**bit** [3] - 821:25, 831:8, 853:11
**bitch** [1] - 811:7
**black** [1] - 816:10
**block** [1] - 800:2
**blue** [4] - 804:19, 814:2, 829:24, 830:8
**boisterous** [1] - 850:12
**bottom** [1] - 849:6
**bought** [2] - 833:5, 834:23
**bound** [1] - 854:18
**break** [9] - 812:6, 814:7, 830:17, 830:21, 832:5, 832:21, 837:22, 838:6
**brief** [2] - 815:18, 853:25
**briefly** [1] - 843:5
**bring** [15] - 801:20, 803:1, 804:10, 806:16, 807:22, 809:9, 809:14, 810:3, 810:14, 815:8, 816:6, 838:3, 840:5, 853:12
**bringing** [2] - 801:19, 837:2
**brought** [3] - 800:5, 800:7, 837:21
**building** [10] - 832:18, 841:18, 841:22, 841:25, 842:20, 842:22, 843:1, 843:7, 843:9, 843:11
**buildings** [2] - 841:23, 842:16
**bulletproof** [1] - 843:24
**burner** [7] - 833:5, 834:12, 834:25, 835:17, 837:4, 837:8, 837:11
**business** [5] - 835:24, 835:25, 836:2, 836:3, 836:6
**buy** [1] - 837:8
**BY** [56] - 803:11, 805:3, 805:12, 806:2, 807:21, 808:3, 808:16, 808:22, 809:8, 809:13, 809:22, 810:10, 810:17, 811:4, 811:13, 811:24, 812:16, 813:5, 813:15,

815:2, 815:11, 815:21, 818:2, 820:5, 820:17, 820:25, 824:5, 825:16, 825:25, 826:11, 827:9, 827:15, 827:21, 828:1, 828:25, 829:19, 830:7, 840:14, 842:8, 845:1, 845:24, 846:16, 846:22, 847:9, 847:16, 849:2, 849:9, 849:23, 850:6, 850:16, 850:25, 851:12, 851:15, 852:2, 852:11, 853:2

## C

**C-E-R-T** [1] - 818:13
**calendar** [2] - 802:14, 802:15
**California** [1] - 797:17
**Cannon** [1] - 841:25
**Capitol** [18] - 809:1, 809:4, 831:2, 838:15, 841:5, 841:7, 841:9, 841:13, 841:16, 841:17, 841:18, 841:22, 841:24, 842:22, 842:25, 843:7, 843:9, 848:22
**case** [14] - 799:11, 801:19, 834:4, 834:6, 834:17, 836:7, 836:12, 838:19, 838:24, 838:25, 839:5, 839:10, 853:3
**Case** [1] - 797:3
**cases** [3] - 833:7, 833:8, 835:22
**CCTV** [1] - 816:22
**CDU** [2] - 826:12, 827:18
**cell** [1] - 800:2
**CERT** [5] - 809:4, 818:11, 818:13, 848:19, 848:21
**certain** [1] - 802:17
**certainly** [1] - 833:22
**CERTIFICATE** [1] - 855:1
**certification** [3] - 833:10, 834:8, 837:15
**certify** [1] - 855:3

**chairs** [2] - 844:6, 844:14
**chalk** [1] - 846:8
**Chamber** [1] - 803:19
**chambers** [1] - 815:6
**chance** [2] - 801:1, 831:22
**change** [4] - 800:9, 800:15, 842:21
**changed** [2] - 842:23, 843:21
**chaos** [1] - 845:19
**charged** [1] - 817:15
**check** [2] - 832:9, 832:10
**checked** [1] - 811:10
**chose** [1] - 818:23
**chronological** [1] - 832:2
**circle** [3] - 805:5, 808:6, 809:16
**circled** [2] - 805:8, 808:8
**circumstances** [1] - 827:17
**civil** [1] - 817:16
**Civil** [1] - 826:13
**clear** [4] - 802:4, 813:22, 813:23, 815:4
**clearly** [3] - 799:22, 828:17, 833:4
**close** [1] - 832:17
**closer** [1] - 830:24
**clothes** [3] - 799:22, 799:25, 800:6
**co** [1] - 815:18
**co-counsel** [1] - 815:18
**colleague** [1] - 837:21
**collectively** [1] - 807:1
**COLUMBIA** [1] - 797:1
**coming** [10] - 802:15, 802:16, 804:3, 809:2, 814:11, 814:13, 817:6, 818:16, 829:24
**communication** [2] - 827:11, 832:1
**completed** [1] - 838:7
**complied** [2] - 805:6, 808:7
**computer** [1] - 797:25
**computer-aided** [1] - 797:25
**concerned** [2] - 822:9, 829:20
**concerns** [3] - 800:23, 812:4, 812:5
**concise** [1] - 818:7

**concludes** [1] - 831:7
**conditionally** [1] - 838:23
**conference** [2] - 816:14, 817:20
**conferred** [1] - 815:20
**Congress** [5] - 803:19, 805:16, 806:4, 813:20, 813:23
**conservatively** [1] - 839:2
**constantly** [3] - 848:1, 848:2, 852:24
**Constitution** [1] - 797:21
**contact** [9] - 811:8, 812:2, 812:5, 821:20, 821:23, 822:1, 825:9, 829:4, 847:5
**contesting** [1] - 836:14
**continue** [19] - 808:20, 809:6, 811:11, 812:3, 812:13, 813:3, 814:24, 815:15, 842:5, 845:21, 847:14, 848:17, 848:25, 849:7, 850:4, 850:14, 851:13, 851:25, 852:9
**Continued** [1] - 803:10
**continued** [1] - 810:1
**contrary** [2] - 833:9, 837:13
**control** [1] - 826:5
**conversation** [4] - 819:19, 821:19, 822:10, 848:18
**copy** [1] - 802:21
**corner** [1] - 804:19
**correct** [30] - 818:15, 818:18, 818:21, 818:22, 818:24, 819:2, 819:6, 819:9, 819:17, 820:19, 820:20, 821:2, 822:16, 822:24, 823:15, 824:18, 824:22, 824:25, 825:5, 825:8, 826:19, 826:22, 826:23, 828:14, 828:18, 841:14, 841:15, 850:1, 850:21, 855:4
**counsel** [4] - 799:6,

806:22, 815:18, 815:20
**Counsel** [1] - 799:15
**couple** [1] - 830:20
**course** [2] - 834:7, 839:14
**COURT** [108] - 797:1, 799:12, 799:16, 799:24, 800:4, 800:8, 800:13, 800:20, 801:4, 801:9, 801:12, 801:16, 801:18, 802:5, 802:10, 802:13, 802:24, 803:4, 804:24, 805:1, 805:22, 806:18, 806:20, 807:3, 807:5, 807:9, 807:12, 807:14, 807:20, 815:19, 816:13, 816:18, 816:24, 817:4, 817:8, 817:13, 817:17, 817:24, 820:1, 820:14, 820:23, 824:2, 825:21, 826:10, 827:8, 827:14, 827:20, 827:25, 828:22, 829:17, 830:2, 830:4, 830:12, 830:14, 830:16, 830:19, 831:9, 831:11, 831:18, 831:21, 831:25, 832:4, 832:10, 832:17, 832:21, 833:3, 833:12, 833:20, 834:3, 834:14, 834:21, 835:8, 835:11, 835:20, 836:5, 836:19, 836:24, 837:1, 837:3, 837:8, 837:12, 837:25, 838:8, 838:12, 838:16, 838:20, 839:4, 839:11, 839:14, 839:17, 839:20, 840:3, 840:7, 842:4, 846:14, 847:8, 851:10, 852:23, 853:7, 853:9, 853:16, 853:21, 853:25, 854:6, 854:8, 854:14, 855:1, 855:9

**Court** [3] - 797:21, 831:14, 837:21
**court** [3] - 799:2, 835:5
**courtroom** [4] - 803:3, 830:18, 840:6, 853:15
**COURTROOM** [1] - 799:4
**cover** [1] - 854:19
**covered** [1] - 853:23
**CR** [1] - 818:12
**craziness** [1] - 845:20
**crazy** [1] - 850:11
**Criminal** [1] - 799:4
**cross** [1] - 839:3
**CROSS** [1] - 818:1
**Cross** [1] - 798:3
**CROSS-EXAMINATION** [1] - 818:1
**Cross-Examination........** [1] - 798:3
**crowd** [7] - 812:22, 813:25, 814:3, 814:21, 820:10, 848:9
**CRR** [1] - 797:21
**cue** [3] - 844:24, 849:21, 850:22
**custodian** [1] - 836:4

## D

**D.C** [3] - 797:5, 797:14, 797:22
**DABNEY** [1] - 797:10
**date** [1] - 802:8
**DATE** [1] - 855:9
**DAY** [1] - 797:9
**de** [1] - 852:21
**de-escalate** [1] - 852:21
**deal** [1] - 832:21
**dear** [1] - 837:21
**December** [1] - 841:8
**decision** [6] - 814:2, 814:6, 814:9, 818:17, 818:19, 828:12
**decisionmaking** [1] - 826:24
**defend** [1] - 814:17
**DEFENDANT** [2] - 800:5, 800:17
**defendant** [19] - 806:10, 808:10, 808:12, 808:17, 809:25, 811:9, 812:1, 812:3,

812:10, 812:19, 815:13, 815:22, 816:7, 816:9, 829:3, 829:7, 835:9, 851:2, 853:3
**Defendant** [2] - 797:7, 797:18
**defendant's** [1] - 809:17
**defense** [3] - 835:5, 836:16, 838:23
**demonstration** [1] - 826:14
**department** [2] - 822:23, 827:18
**DEPUTY** [2] - 799:4, 800:1
**describe** [4] - 804:1, 826:12, 844:2, 845:20
**described** [2] - 824:20, 824:23
**describing** [1] - 821:7
**diary** [2] - 802:14, 802:15
**Diego** [1] - 797:17
**different** [3] - 803:18, 827:6, 831:7
**differently** [1] - 812:24
**difficult** [2] - 817:11, 817:15
**Direct** [2] - 798:3, 798:6
**direct** [4] - 838:7, 839:3, 853:9, 853:25
**DIRECT** [2] - 803:10, 840:13
**direction** [2] - 813:11, 827:11
**directly** [3] - 808:19, 831:15, 846:12
**discuss** [1] - 815:18
**discussing** [1] - 803:12
**disorder** [1] - 817:16
**dispersed** [1] - 848:10
**distinctly** [2] - 850:8, 850:10
**DISTRICT** [3] - 797:1, 797:1, 797:10
**Disturbance** [1] - 826:13
**Division** [2] - 841:21, 842:21
**done** [4] - 802:13, 816:20, 816:25, 817:12
**door** [23] - 803:21, 806:8, 816:17, 818:21, 819:1,

819:5, 843:12, 843:13, 843:15, 843:17, 843:19, 843:23, 844:3, 844:5, 844:6, 844:15, 844:16, 844:17, 847:13, 849:3, 850:19, 852:8, 853:1
**Door** [3] - 843:8, 843:11, 846:11
**doors** [15] - 803:13, 803:17, 803:24, 804:16, 808:9, 814:7, 819:14, 828:3, 829:25, 844:9, 844:10, 847:21, 848:14, 850:18, 852:5
**doorway** [2] - 804:5, 844:18
**down** [17] - 814:7, 817:18, 818:10, 818:14, 818:16, 819:10, 828:2, 828:5, 828:7, 828:10, 831:24, 848:20, 849:10, 850:20, 851:18, 852:25, 854:10
**downstairs** [2] - 800:3, 853:13
**draw** [2] - 836:9, 846:4
**dressed** [1] - 800:2
**dropped** [1] - 799:17
**during** [13] - 819:21, 822:7, 822:11, 822:15, 823:14, 827:11, 835:5, 837:22, 846:5, 848:8, 848:13, 852:12, 852:16
**dust** [1] - 846:8
**duty** [1] - 843:24

## E

**early** [5] - 830:20, 832:5, 832:12, 832:21, 853:11
**eat** [2] - 832:22, 837:22
**either** [2] - 838:25, 848:8
**employed** [2] - 840:21, 841:13
**empty** [1] - 844:7
**end** [7] - 802:11, 832:23, 836:23, 839:5, 842:18,

844:5, 852:9
**End** [1] - 817:20
**enforcement** [3] - 841:2, 843:18, 847:24
**engaging** [1] - 819:19
**ensure** [3] - 803:22, 818:20, 837:20
**entered** [2] - 803:3, 840:6
**entertain** [1] - 834:7
**entire** [2] - 802:21, 854:12
**entitled** [1] - 855:5
**entries** [1] - 802:17
**equation** [1] - 848:1
**escalate** [2] - 852:21
**escalated** [1] - 852:24
**especially** [1] - 799:19
**ESQ** [1] - 797:18
**established** [1] - 842:17
**establishing** [1] - 842:18
**estimate** [3] - 831:12, 845:15, 845:16
**evacuate** [1] - 828:7
**evacuated** [2] - 803:22, 813:24
**evacuating** [3] - 803:19, 804:5, 813:20
**event** [1] - 826:20
**eventually** [2] - 803:23, 851:18
**evidence** [13] - 805:2, 806:17, 807:1, 807:17, 807:19, 817:5, 817:8, 831:17, 836:10, 836:11, 844:23, 849:20, 854:2
**EXAMINATION** [5] - 803:10, 818:1, 828:24, 830:6, 840:13
**Examination............** [1] - 798:4
**Examination............** [1] - 798:4
**Examination............** . [2] - 798:3, 798:6
**Examination............** .. [1] - 798:3
**example** [2] - 835:9, 835:10
**except** [1] - 838:20
**exception** [8] - 833:7, 834:2, 834:5, 835:22, 835:23,

835:24, 836:1, 836:6
**excuse** [1] - 806:16
**excused** [1] - 830:12
**exhausted** [2] - 814:19, 814:20
**Exhibit** [8] - 804:10, 804:13, 804:23, 805:2, 814:25, 844:22, 849:19, 850:22
**exhibit** [2] - 804:18, 854:13
**EXHIBITS** [1] - 798:8
**exhibits** [6] - 806:20, 807:15, 831:5, 831:16, 854:6, 854:7
**Exhibits** [1] - 807:16
**exited** [2] - 830:18, 853:15
**expect** [3] - 801:22, 831:9, 842:5
**expectation** [1] - 801:25
**expedition** [1] - 801:21
**experience** [1] - 841:1
**explain** [2] - 841:4, 847:17
**extent** [1] - 854:15
**extinguisher** [2] - 846:10, 846:15

## F

**face** [4] - 804:19, 846:12, 847:13, 850:13
**facing** [1] - 804:2
**fact** [4] - 833:16, 834:14, 834:18, 836:19
**fair** [5] - 820:12, 822:1, 822:23, 823:8, 823:12
**faith** [1] - 839:18
**far** [3] - 828:2, 834:2, 838:22
**FBI** [6] - 838:14, 840:10, 840:22, 840:24, 841:5, 841:9
**fear** [2] - 824:12, 831:12
**feet** [1] - 828:5
**fellow** [14] - 809:23, 809:24, 813:17, 815:12, 821:9, 821:17, 822:9, 825:4, 825:8, 825:12, 825:14, 826:2, 826:7, 826:8

**Field** [1] - 840:23
**fight** [2] - 814:20, 826:21
**figure** [1] - 832:24
**fine** [5] - 810:14, 827:7, 839:6, 854:14
**fire** [2] - 846:10, 846:15
**fires** [1] - 816:2
**first** [12] - 809:1, 818:5, 818:11, 818:14, 823:4, 823:6, 823:7, 823:20, 824:3, 843:5, 843:7, 844:5
**fishing** [1] - 801:21
**fits** [2] - 833:8, 834:5
**five** [2] - 832:18, 841:6
**floor** [1] - 809:1
**Floor** [1] - 797:19
**focus** [1] - 843:4
**follow** [1] - 830:4
**follow-up** [1] - 830:4
**food** [1] - 838:2
**foot** [1] - 824:17
**FOR** [3] - 797:1, 803:9, 840:12
**foregoing** [1] - 855:3
**foremost** [1] - 818:5
**forgot** [1] - 843:21
**form** [3] - 819:24, 847:7, 852:22
**formally** [1] - 838:25
**formed** [1] - 827:5
**four** [2] - 807:22, 836:5
**frame** [3] - 845:12, 845:13, 851:23
**freeze** [1] - 845:12
**FRIEDRICH** [1] - 797:10
**friend** [2] - 835:2, 835:3
**frills** [2] - 837:10, 837:11
**front** [6] - 799:19, 803:20, 806:8, 808:19, 819:13, 853:13
**Front** [1] - 797:16
**fuck** [3] - 814:1, 829:24, 830:8
**full** [1] - 826:25
**fur** [5] - 846:24, 847:19, 847:20, 849:16, 850:8
**furniture** [1] - 803:18

## G

**gear** [5] - 814:16, 826:16, 826:21, 826:22, 843:25
**general** [1] - 835:2
**generally** [1] - 850:18
**gentleman** [1] - 847:20
**gentlemen** [3] - 803:4, 840:7, 853:10
**given** [2] - 826:20, 830:24
**glass** [8] - 806:7, 820:11, 829:4, 844:10, 844:11, 847:12, 847:21
**goal** [3] - 803:21, 818:20, 848:4
**good-faith** [1] - 839:18
**government** [11] - 801:1, 801:13, 802:16, 815:20, 830:16, 833:3, 838:4, 838:20, 839:9, 839:22, 840:10
**Government** [6] - 798:9, 798:9, 805:2, 807:16, 849:19, 850:22
**GOVERNMENT** [2] - 803:9, 840:12
**government's** [3] - 831:18, 834:17, 838:9
**Government's** [1] - 844:22
**Grab** [1] - 842:25
**great** [2] - 837:17, 838:2
**group** [2] - 803:23, 819:10
**guarantee** [1] - 832:15
**guess** [4] - 799:21, 833:11, 836:2, 849:5
**gun** [2] - 819:1, 835:4
**guy** [1] - 819:1
**guys** [2] - 831:3, 851:2

## H

**half** [1] - 839:3
**hallway** [13] - 803:16, 804:2, 804:3, 813:22, 813:23, 815:4, 819:10, 829:10, 829:13, 844:7, 845:19,

846:2, 848:17
**hand** [1] - 809:17
**handful** [1] - 843:8
**handgun** [1] - 843:25
**handle** [1] - 827:23
**hands** [3] - 812:20, 820:3, 820:6
**hard** [2] - 802:21, 826:16
**hat** [9] - 808:13, 845:13, 846:24, 847:19, 847:20, 849:16, 849:17, 849:18, 850:8
**head** [3] - 811:19, 816:11, 848:3
**heading** [1] - 818:14
**hear** [3] - 805:14, 810:11, 811:5
**heard** [5] - 802:9, 811:6, 818:6, 851:7
**hearing** [1] - 801:5
**hearings** [1] - 839:5
**hearsay** [4] - 833:7, 834:2, 834:5, 835:21
**helmet** [5] - 809:18, 810:1, 815:14, 816:10, 850:17
**help** [2] - 838:2, 843:1
**helpful** [1] - 853:13
**helping** [1] - 811:7
**hit** [8] - 822:12, 822:16, 823:5, 823:15, 823:21, 824:9, 824:14, 826:8
**hitting** [6] - 812:25, 820:11, 825:7, 825:11, 826:7, 851:16
**holding** [1] - 816:10
**Honor** [46] - 799:4, 799:8, 799:15, 799:17, 800:1, 800:12, 800:19, 801:2, 802:3, 803:8, 804:22, 804:25, 805:19, 806:25, 815:17, 816:12, 817:19, 817:25, 819:23, 820:21, 823:25, 827:4, 830:3, 830:13, 830:15, 831:6, 831:20, 832:8, 832:13, 832:14, 832:20, 832:25, 837:20, 838:4, 838:5, 838:11, 838:22, 838:23, 840:2, 840:9, 842:1,

842:7, 853:8, 853:20, 853:23, 854:9
**HONORABLE** [1] - 797:10
**hope** [1] - 839:7
**hour** [4] - 802:19, 823:12, 839:3, 854:10
**hours** [1] - 823:10
**house** [1] - 805:15
**House** [6] - 803:19, 841:21, 842:16, 842:20, 843:12, 843:13
**house'** [1] - 805:24
**hundred** [1] - 814:5

## I

**identified** [1] - 824:9
**identify** [1] - 847:10
**II** [1] - 797:18
**image** [1] - 805:8
**immediately** [2] - 844:18, 849:11
**impeachment** [1] - 827:5
**important** [1] - 816:18
**impossible** [2] - 837:24, 837:25
**impression** [1] - 848:21
**improper** [1] - 827:5
**incident** [2] - 821:17, 823:1
**indicating** [2] - 805:7, 808:8
**indicia** [2] - 835:14, 835:21
**individual** [6] - 805:8, 806:7, 806:9, 821:8, 846:24, 847:1
**individuals** [4] - 804:3, 806:3, 844:16, 851:20
**indulgence** [1] - 815:18
**infer** [1] - 833:18
**inference** [7] - 833:23, 834:20, 834:24, 835:1, 835:16, 835:19, 836:8
**information** [1] - 842:5
**injuries** [1] - 826:24
**inquiry** [1] - 802:2
**inside** [1] - 815:5
**instead** [1] - 842:19
**instructions** [1] -

800:23
**intend** [1] - 802:23
**intent** [1] - 814:21
**interaction** [2] - 848:8, 848:14
**interactions** [1] - 847:3
**interim** [1] - 853:18
**Internal** [3] - 822:3, 822:4, 822:25
**interpret** [1] - 812:24
**interview** [4] - 822:7, 822:11, 822:15, 823:14
**interviewed** [3] - 821:4, 823:10, 823:11
**introduce** [1] - 854:12
**introducing** [1] - 833:20
**iPhone** [1] - 833:17
**issue** [5] - 801:7, 823:10, 833:3, 838:21, 854:5
**issues** [3] - 825:2, 853:22, 854:1
**itself** [3] - 833:25, 841:22, 844:11

**J**

**jacket** [2] - 844:1
**January** [5] - 804:20, 827:12, 833:5, 841:14, 842:18
**job** [4] - 817:11, 817:15, 829:14, 853:4
**joined** [1] - 799:9
**JORDAN** [1] - 797:6
**Joseph** [1] - 799:8
**JOSEPH** [1] - 797:15
**JUDGE** [1] - 797:10
**July** [2] - 841:10, 841:11
**jurors** [1] - 830:20
**jury** [12] - 799:20, 800:23, 802:25, 803:1, 813:17, 824:23, 838:3, 840:5, 840:18, 840:20, 844:2, 847:11
**JURY** [1] - 797:9
**Jury** [6] - 799:3, 803:3, 830:18, 833:2, 840:6, 853:15

**K**

**keep** [3] - 802:25, 839:6, 839:23
**kept** [2] - 846:2, 847:20
**kidding** [1] - 838:1
**kill** [2] - 835:4
**kind** [2] - 810:20, 837:6
**knowing** [3] - 814:6, 818:19, 828:13
**knowledge** [5] - 814:7, 815:5, 821:22, 837:6, 852:17
**known** [1] - 837:23
**Kyle** [4] - 831:1, 838:14, 840:10, 840:19
**KYLE** [2] - 798:6, 840:12

**L**

**lack** [2] - 827:10, 831:25
**ladies** [3] - 803:4, 840:7, 853:10
**Lanciano** [7] - 804:9, 810:24, 822:22, 843:16, 843:19, 844:4, 845:9
**last** [11] - 801:4, 805:19, 805:22, 807:6, 815:22, 823:25, 825:20, 838:13, 840:17, 841:10, 847:10
**law** [4] - 834:4, 841:1, 843:18, 847:24
**leading** [1] - 842:2
**leads** [1] - 808:25
**leave** [11] - 814:10, 818:17, 818:19, 819:15, 819:17, 820:8, 820:12, 828:12, 828:16, 828:17, 841:9
**leaves** [1] - 816:22
**leaving** [2] - 816:23, 843:11
**Lederer** [4] - 799:9, 803:7, 828:22, 834:4
**LEDERER** [72] - 797:13, 801:2, 801:6, 803:8, 803:11, 804:22, 805:3, 805:12, 806:2, 806:19,

806:22, 806:25, 807:4, 807:7, 807:11, 807:13, 807:18, 807:21, 808:3, 808:16, 808:22, 809:8, 809:13, 809:22, 810:10, 810:17, 811:4, 811:13, 811:24, 812:16, 813:5, 813:15, 815:2, 815:11, 815:17, 815:21, 816:20, 817:10, 817:14, 817:19, 817:21, 819:23, 820:13, 823:22, 825:15, 825:18, 826:9, 827:4, 827:13, 827:19, 827:24, 828:25, 829:19, 830:1, 831:5, 831:20, 831:22, 832:2, 832:14, 832:19, 834:9, 834:19, 834:24, 835:10, 835:13, 836:2, 836:16, 837:7, 837:10, 837:16, 854:1, 854:7
**left** [4] - 806:15, 826:21, 831:2, 845:8
**less** [3] - 837:10, 837:11, 845:16
**limited** [1] - 834:2
**line** [7] - 844:19, 844:20, 845:6, 848:6, 848:23, 850:3, 853:13
**list** [5] - 806:22, 806:24, 807:5, 807:8, 831:5
**listen** [1] - 811:2
**listening** [1] - 810:12
**literally** [2] - 816:20, 835:14
**Lively** [27] - 803:2, 803:12, 804:12, 805:5, 805:13, 807:24, 808:4, 808:23, 809:16, 809:23, 810:5, 810:11, 811:15, 811:25, 813:6, 813:16, 815:3, 815:12, 815:22, 817:21, 818:3, 831:13, 843:20, 845:9, 848:18,

848:19, 848:24
**LIVELY** [2] - 798:3, 803:9
**Lively's** [1] - 803:6
**Lobby** [18] - 803:13, 803:21, 803:24, 804:16, 807:24, 808:25, 843:12, 843:13, 843:15, 843:17, 843:23, 844:3, 844:9, 844:11, 845:15, 846:18, 852:13, 852:20
**lobby** [1] - 803:16
**located** [1] - 850:18
**location** [1] - 843:14
**locker** [1] - 799:23
**Longworth** [2] - 841:25, 842:20
**look** [4] - 801:1, 801:6, 834:9, 837:16
**looked** [6] - 800:6, 802:14, 813:21, 819:10, 820:3, 820:6
**looking** [5] - 810:5, 811:15, 833:7, 834:4, 845:7
**loud** [2] - 847:22, 850:11
**loudest** [1] - 812:11
**Luciano** [1] - 822:21
**lunch** [15] - 802:19, 802:24, 832:5, 832:12, 832:22, 834:10, 837:16, 837:22, 837:24, 838:1, 853:11, 853:17, 854:2, 854:10

**M**

**Macechko** [1] - 799:10
**magazine** [1] - 843:25
**maintaining** [1] - 850:3
**man** [3] - 847:18, 849:16, 850:8
**marked** [1] - 844:1
**Marketos** [2] - 799:10, 838:19
**marshal** [1] - 800:21
**MARSHAL** [1] - 800:1
**marshals** [2] - 799:21, 799:24
**mask** [1] - 804:19
**match** [1] - 813:1
**matter** [5] - 833:6, 833:15, 833:21,

835:17, 855:5
**matters** [2] - 818:6, 839:5
**McIntyre** [1] - 838:22
**mean** [5] - 802:9, 816:24, 816:25, 819:4, 839:8
**means** [1] - 832:4
**meant** [1] - 835:6
**meet** [3] - 802:22, 835:11, 835:25
**meeting** [1] - 824:20
**Melissa** [1] - 799:10
**members** [10] - 803:19, 803:22, 804:5, 805:16, 806:4, 811:21, 812:8, 813:20, 813:23, 814:8
**memorable** [1] - 847:22
**Memorial** [3] - 843:8, 843:11, 846:11
**memory** [1] - 849:16
**mentioned** [4] - 807:9, 849:10, 850:7, 851:17
**met** [3] - 835:24, 836:6, 843:20
**METCALF** [69] - 797:18, 799:13, 799:17, 800:7, 800:11, 800:14, 800:18, 801:11, 801:15, 801:17, 802:3, 802:8, 802:12, 804:25, 805:19, 806:1, 806:24, 816:12, 816:15, 817:2, 817:7, 817:25, 818:2, 820:5, 820:17, 820:21, 820:24, 820:25, 823:25, 824:5, 825:16, 825:20, 825:24, 825:25, 826:11, 827:7, 827:9, 827:15, 827:21, 828:1, 828:20, 828:23, 829:16, 830:3, 830:5, 830:7, 830:11, 830:13, 831:3, 831:6, 832:13, 832:25, 836:18, 836:22, 836:25, 837:2, 837:20, 838:5, 839:8, 839:12,

839:16, 839:19, 842:1, 846:13, 847:7, 851:8, 852:22, 853:6, 853:23
**Metcalf** [16] - 797:18, 799:12, 799:14, 801:9, 801:13, 802:22, 817:24, 819:24, 820:1, 823:23, 832:11, 832:21, 837:23, 839:7, 854:3
**middle** [2] - 808:9, 845:9
**might** [1] - 853:12
**Miller** [1] - 854:18
**mind** [2] - 826:3, 847:23
**mine** [1] - 837:21
**minimum** [1] - 854:11
**minute** [1] - 845:16
**minutes** [7] - 807:23, 809:10, 823:13, 830:22, 830:23, 831:15, 832:18
**mission** [1] - 848:4
**Monday** [8] - 800:22, 801:10, 801:19, 802:7, 838:24, 838:25, 839:23, 840:1
**mood** [2] - 845:17, 845:19
**morning** [19] - 799:8, 799:15, 799:16, 799:18, 800:2, 800:22, 801:3, 803:4, 803:5, 818:3, 829:1, 829:2, 838:13, 838:14, 839:1, 839:23, 840:15, 840:16
**MORNING** [1] - 797:9
**most** [5] - 812:6, 812:11, 839:3, 847:22, 850:11
**move** [6] - 804:23, 805:20, 807:1, 817:8, 848:14, 851:8
**moved** [12] - 809:24, 809:25, 813:17, 813:18, 814:11, 815:3, 848:16, 849:3, 849:24, 850:2, 851:18, 852:25
**movement** [1] - 825:12
**moving** [3] - 815:12,

821:25, 839:23
**MPD's** [1] - 822:4
**MR** [107] - 799:8, 799:13, 799:17, 800:7, 800:11, 800:14, 800:18, 801:11, 801:15, 801:17, 802:3, 802:8, 802:12, 802:21, 804:25, 805:19, 806:1, 806:24, 816:12, 816:15, 817:2, 817:7, 817:25, 818:2, 820:5, 820:17, 820:21, 820:24, 820:25, 823:25, 824:5, 825:16, 825:20, 825:24, 825:25, 826:11, 827:7, 827:9, 827:15, 827:21, 828:1, 828:20, 828:23, 829:16, 830:3, 830:5, 830:7, 830:11, 830:13, 831:1, 831:3, 831:6, 831:10, 831:12, 832:8, 832:13, 832:25, 833:11, 833:14, 833:22, 836:18, 836:22, 836:25, 837:2, 837:20, 837:23, 838:4, 838:5, 838:11, 838:13, 838:17, 838:22, 839:8, 839:12, 839:16, 839:19, 840:2, 840:9, 840:14, 842:1, 842:7, 842:8, 845:1, 845:24, 846:13, 846:16, 846:22, 847:7, 847:9, 847:16, 849:2, 849:9, 849:23, 850:6, 850:16, 850:25, 851:8, 851:12, 851:15, 852:2, 852:11, 852:22, 853:2, 853:6, 853:8, 853:23, 854:9
**MS** [71] - 801:2, 801:6, 803:8, 803:11, 804:22, 805:3, 805:12, 806:2, 806:19, 806:22, 806:25, 807:4,

807:7, 807:11, 807:13, 807:18, 807:21, 808:3, 808:16, 808:22, 809:8, 809:13, 809:22, 810:10, 810:17, 811:4, 811:13, 811:24, 812:16, 813:5, 813:15, 815:2, 815:11, 815:17, 815:21, 816:20, 817:10, 817:14, 817:19, 817:21, 819:23, 820:13, 823:22, 825:15, 825:18, 826:9, 827:4, 827:13, 827:19, 827:24, 828:25, 829:19, 830:1, 831:5, 831:20, 831:22, 832:2, 832:14, 832:19, 834:9, 834:19, 834:24, 835:10, 835:13, 836:2, 836:16, 837:7, 837:10, 837:16, 854:1, 854:7

**N**

**name** [3] - 840:17, 840:19
**names** [1] - 799:7
**near** [2] - 841:17, 841:18
**nearest** [1] - 842:24
**necessary** [1] - 800:17
**need** [17] - 799:25, 816:24, 817:13, 830:21, 831:8, 831:11, 832:4, 832:22, 833:9, 834:8, 837:15, 839:4, 848:2, 848:3, 853:22, 854:11, 854:15
**needs** [2] - 835:11
**never** [4] - 820:18, 821:1, 830:8, 852:19
**New** [2] - 797:20
**next** [15] - 812:2, 814:3, 825:11, 829:7, 829:11, 830:16, 830:25, 831:18, 831:21, 839:5, 843:10, 848:1, 848:2, 848:3, 850:13

**nonresponsive** [1] - 851:8
**Norm** [1] - 837:21
**normally** [1] - 842:16
**Northwest** [2] - 797:14, 797:21
**notebook** [3] - 802:22, 854:9, 854:12
**nothing** [5] - 828:23, 830:1, 834:16, 836:6, 837:17
**notice** [1] - 800:9
**Number** [1] - 797:3
**number** [1] - 830:24
**numerous** [1] - 826:24

**O**

**oath** [2] - 824:6, 824:12
**object** [8] - 809:16, 813:6, 817:6, 819:23, 827:4, 836:18, 836:20, 842:3
**objected** [1] - 802:14
**objection** [20] - 804:24, 804:25, 805:19, 806:24, 807:15, 816:12, 820:13, 823:22, 825:15, 825:18, 826:9, 827:13, 827:19, 827:24, 829:16, 846:13, 847:7, 851:8, 852:22, 853:6
**objections** [2] - 802:19, 802:20
**obscured** [2] - 845:11, 845:13
**obviously** [4] - 821:4, 824:18, 849:24, 850:12
**OC** [1] - 814:19
**occurring** [1] - 828:14
**OF** [5] - 797:1, 797:3, 797:9, 855:1, 855:9
**offer** [2] - 802:23, 833:23
**offered** [1] - 833:25
**office** [1] - 842:16
**Office** [3] - 797:13, 797:16, 840:23
**officer** [17] - 808:8, 809:2, 810:20, 810:23, 816:2, 824:6, 826:1, 827:10, 827:16, 828:2, 831:2, 838:6,

838:15, 841:13, 846:23, 847:24, 848:22
**Officer** [15] - 804:9, 810:22, 810:24, 822:16, 822:20, 822:21, 823:2, 823:18, 828:20, 843:16, 843:19, 844:3, 845:9, 849:3
**officers** [36] - 801:20, 801:21, 809:24, 809:25, 813:17, 814:2, 814:10, 815:12, 818:11, 818:12, 818:18, 818:23, 821:1, 821:9, 821:18, 822:9, 822:18, 824:24, 825:4, 825:8, 825:12, 825:14, 826:2, 826:7, 826:8, 826:25, 839:12, 839:17, 842:21, 842:25, 843:8, 844:20, 845:6, 845:7, 847:21, 852:17
**official** [1] - 842:24
**Official** [1] - 797:21
**OFFICIAL** [1] - 855:1
**once** [3] - 822:8, 843:19, 848:17
**one** [21] - 806:7, 812:6, 812:11, 812:22, 814:9, 815:24, 817:10, 817:14, 820:3, 821:8, 823:11, 825:22, 830:3, 831:2, 833:3, 839:22, 840:25, 841:23, 842:16, 845:7, 846:12
**ones** [2] - 825:1
**open** [1] - 839:14
**opening** [1] - 839:15
**opens** [1] - 816:17
**opinion** [1] - 821:16
**opposed** [1] - 801:25
**order** [5] - 799:2, 826:16, 832:3, 833:9, 838:10
**ordered** [1] - 814:10
**otherwise** [2] - 834:7, 836:8
**ought** [1] - 802:1
**overcrowded** [1] - 848:17

**overflowed** [1] - 844:7
**overflowing** [1] - 846:2
**overruled** [5] - 820:14, 824:2, 829:17, 852:23, 853:7
**overrun** [1] - 842:22
**own** [2] - 827:18, 837:4

## P

**P.C** [1] - 797:18
**p.m** [2] - 842:12, 842:13
**pages** [1] - 802:23
**panes** [1] - 806:7
**paper** [1] - 834:16
**paralegal** [1] - 799:10
**pare** [1] - 854:10
**Park** [1] - 797:19
**parking** [1] - 832:15
**part** [1] - 849:6
**particular** [1] - 847:18
**parties** [1] - 802:13
**passing** [1] - 852:25
**Patrick** [1] - 838:18
**Pattis** [1] - 837:21
**PATTIS** [1] - 837:23
**pause** [11] - 808:14, 808:20, 809:14, 810:18, 810:25, 811:11, 812:13, 812:17, 813:3, 813:13, 851:16
**paused** [7] - 806:11, 808:23, 811:25, 812:18, 837:11, 851:1, 852:3
**pausing** [2] - 808:1, 815:9
**people** [15] - 805:14, 806:5, 815:5, 816:4, 819:4, 819:18, 819:21, 819:22, 821:5, 821:19, 839:8, 846:6, 848:10, 848:18
**pepper** [2] - 814:19, 843:25
**perceptions** [1] - 845:17
**perfect** [1] - 835:10
**perform** [1] - 853:4
**period** [4] - 846:5, 849:12, 849:13, 852:12
**permission** [1] - 838:24
**person** [8] - 810:20,

813:7, 834:15, 834:16, 835:5, 836:10, 848:23, 850:12
**personnel** [1] - 843:18
**phone** [12] - 800:21, 833:17, 833:19, 833:24, 834:1, 834:12, 834:25, 835:14, 835:17, 837:5, 837:6, 837:8
**phones** [11] - 833:5, 833:15, 836:13, 836:14, 836:20, 836:21, 837:1, 837:3, 837:4, 837:8, 837:11
**photograph** [1] - 846:7
**phrase** [2] - 835:7, 835:8
**phrased** [1] - 842:2
**physical** [2] - 854:2, 854:7
**physically** [5] - 814:20, 820:18, 821:1, 824:10
**pictures** [1] - 836:22
**piece** [1] - 834:15
**place** [1] - 816:25
**Plaintiff** [1] - 797:4
**plate** [1] - 801:14
**plates** [1] - 800:22
**platoon** [1] - 826:12
**play** [27] - 805:4, 805:10, 808:1, 808:14, 808:20, 809:6, 809:10, 809:19, 810:8, 810:25, 811:22, 812:13, 813:3, 813:13, 814:24, 815:8, 815:15, 831:13, 831:16, 844:24, 845:21, 846:18, 846:20, 847:14, 849:7, 850:23, 851:25
**play/pause** [1] - 811:14
**played** [32] - 805:11, 808:2, 808:15, 808:21, 809:7, 809:12, 809:21, 810:9, 810:16, 811:3, 811:12, 811:23, 812:15, 813:4, 813:14, 815:1, 815:10, 815:16, 844:25,

845:23, 846:21, 847:15, 848:9, 849:1, 849:8, 849:22, 850:5, 850:15, 850:24, 851:14, 852:1, 852:10
**playing** [3] - 848:25, 851:13, 852:9
**podium** [1] - 799:6
**point** [38] - 803:15, 803:20, 807:12, 810:5, 811:18, 812:22, 813:22, 813:25, 814:8, 814:14, 814:17, 819:12, 820:3, 824:6, 836:1, 845:18, 845:25, 846:1, 846:2, 846:4, 846:23, 847:18, 847:23, 847:24, 848:4, 848:8, 848:13, 849:7, 849:19, 849:24, 850:2, 850:23, 851:20, 852:12, 852:16, 854:2, 854:5
**Police** [8] - 809:4, 831:2, 838:15, 841:6, 841:7, 841:9, 841:13, 848:22
**police** [4] - 844:19, 844:20, 848:6, 850:3
**portion** [2] - 805:22, 808:17
**position** [3] - 814:11, 839:9, 848:21
**possession** [2] - 833:17, 836:21
**possibly** [1] - 818:8
**post** [3] - 842:17, 842:18, 842:21
**posture** [1] - 825:4
**potentially** [1] - 836:11
**prediction** [1] - 831:11
**prefer** [1] - 832:2
**prejudicial** [1] - 836:11
**prepare** [1] - 832:22
**presence** [1] - 817:11
**present** [3] - 799:3, 833:2, 839:10
**press** [8] - 805:4, 805:10, 808:14, 809:10, 809:14, 809:19, 810:25, 811:22
**presumably** [3] -

801:14, 804:20, 837:5
**pretty** [1] - 844:7
**prevent** [1] - 848:7
**previously** [3] - 813:21, 844:23, 849:20
**problem** [3] - 812:23, 836:9, 851:3
**problems** [1] - 847:25
**proceed** [2] - 800:19, 807:14
**Proceedings** [1] - 797:24
**proceedings** [1] - 855:4
**process** [1] - 847:25
**produced** [1] - 797:25
**prongs** [1] - 836:5
**proof** [1] - 834:19
**protect** [1] - 824:24
**protective** [4] - 814:16, 825:4, 825:12, 826:22
**protest** [1] - 826:14
**protestor** [1] - 828:7
**protestors** [5] - 829:23, 844:8, 846:3, 848:7, 852:25
**prove** [1] - 833:25
**proven** [1] - 817:17
**proves** [1] - 836:7
**provide** [1] - 799:22
**provided** [2] - 799:25, 806:22
**pull** [3] - 844:22, 849:19, 850:22
**punch** [7] - 806:14, 806:15, 824:10, 824:11, 824:12, 826:5, 847:12
**punched** [6] - 812:2, 820:18, 821:1, 821:20, 825:9, 850:12
**punching** [9] - 806:7, 812:3, 812:4, 812:12, 826:4, 829:3, 829:4, 847:20
**purchase** [2] - 834:19, 835:14
**purchased** [4] - 833:15, 833:18, 834:1
**purports** [1] - 834:22
**purposes** [1] - 845:4
**pushed** [1] - 847:12
**put** [5] - 801:21, 825:3, 826:16, 826:21, 827:22

**putting** [1] - 812:19

## Q

**questions** [5] - 817:9, 817:22, 840:4, 842:2, 853:8
**quick** [4] - 811:14, 830:3, 838:5, 842:23
**quickly** [2] - 843:22, 844:7
**quite** [2] - 800:1, 835:24

## R

**radio** [1] - 827:11
**rather** [1] - 837:4
**Rayburn** [1] - 841:25
**reach** [1] - 806:20
**read** [1] - 801:25
**ready** [5] - 800:19, 832:17, 838:3, 839:7, 847:12
**real** [2] - 811:14, 838:5
**realized** [1] - 830:19
**really** [5] - 817:13, 819:19, 833:9, 837:14, 842:23
**reason** [2] - 833:22, 834:1
**reasons** [1] - 853:10
**reassure** [1] - 851:5
**Rebekah** [1] - 799:9
**REBEKAH** [1] - 797:13
**receipt** [11] - 833:4, 833:25, 834:3, 834:11, 834:12, 834:22, 835:15, 835:16, 835:18, 836:2
**receipts** [2] - 836:18, 836:19
**RECEIVED** [1] - 798:8
**received** [2] - 805:2, 807:16
**Recess** [2] - 833:1, 854:17
**recess** [2] - 832:8, 853:11
**recognize** [3] - 804:12, 809:2, 840:3
**recollection** [2] - 823:23, 836:23
**reconsider** [1] - 837:14
**record** [13] - 799:7, 799:21, 805:7, 808:8, 810:18,

812:17, 835:24, 835:25, 836:3, 836:6, 845:4, 855:4
**recorded** [1] - 797:24
**RECROSS** [1] - 830:6
**Recross** [1] - 798:4
**RECROSS-EXAMINATION** [1] - 830:6
**Recross-Examination...........** [1] - 798:4
**red** [1] - 845:13
**redactions** [2] - 802:13, 854:11
**REDIRECT** [1] - 828:24
**Redirect** [1] - 798:4
**referring** [1] - 807:18
**reform** [1] - 827:7
**refresh** [1] - 823:23
**refresher** [1] - 804:7
**regarding** [1] - 854:9
**regards** [1] - 827:17
**regular** [1] - 837:5
**relating** [1] - 825:22
**relation** [1] - 806:14
**relevance** [7] - 816:12, 833:13, 834:14, 836:12, 836:25, 837:3, 846:13
**relevancy** [3] - 827:13, 827:19, 827:24
**relevant** [1] - 836:12
**reliability** [2] - 835:15, 835:21
**remain** [1] - 816:4
**remainder** [3] - 805:24, 809:19, 814:24
**remains** [1] - 805:24
**remember** [25] - 812:9, 819:16, 820:8, 820:9, 821:9, 821:14, 821:18, 821:24, 822:3, 822:7, 822:10, 822:11, 822:13, 822:14, 823:3, 827:1, 827:2, 827:3, 842:11, 846:1, 847:1, 847:3, 847:21, 848:16, 849:18
**remembered** [1] - 850:8
**remove** [1] - 818:23
**reopen** [1] - 838:25
**rephrase** [3] - 822:14, 825:22, 827:8

**replay** [1] - 810:13
**report** [3] - 842:11, 842:12, 842:21
**reported** [1] - 854:18
**Reporter** [1] - 797:21
**REPORTER** [2] - 855:1, 855:9
**reports** [1] - 802:1
**residual** [3] - 833:7, 834:5, 835:21
**resolve** [1] - 854:15
**resources** [1] - 826:25
**respond** [1] - 842:25
**responded** [4] - 842:23, 843:11, 843:14, 843:19
**responding** [2] - 844:17, 846:11
**responsibility** [2] - 841:22, 841:24
**rest** [4] - 838:20, 838:23, 838:25, 851:11
**rests** [2] - 801:13, 839:9
**resulted** [1] - 826:24
**resume** [3] - 803:1, 803:5, 853:17
**RESUMED** [1] - 803:9
**revised** [1] - 800:23
**rioter** [1] - 816:1
**rioters** [8] - 815:24, 817:14, 842:23, 844:8, 846:12, 848:7, 852:17, 852:25
**rioters'** [1] - 817:11
**room** [3] - 836:15, 836:20, 845:18
**Room** [1] - 797:22
**Rosemaria** [2] - 799:10, 838:18
**rough** [1] - 818:7
**RPR** [1] - 797:21
**ruled** [1] - 802:15
**running** [1] - 848:2

## S

**safe** [1] - 852:13
**safely** [1] - 803:22
**safety** [2] - 818:20, 829:20
**San** [1] - 797:17
**SARA** [1] - 797:21
**Sara** [2] - 855:3, 855:8
**saw** [10] - 806:6, 815:4, 818:11, 818:14, 819:20, 819:22, 826:6,

844:14, 852:6
**scene** [3] - 819:13, 844:2, 845:15
**scheduled** [2] - 842:9, 842:12
**scheduling** [1] - 853:10
**scrambling** [1] - 800:24
**scream** [1] - 805:16
**screaming** [8] - 805:16, 805:24, 806:3, 806:5, 814:1, 829:24, 846:6, 847:21
**screen** [4] - 805:4, 811:15, 817:3, 845:8
**second** [3] - 809:24, 833:19, 833:24
**seconds** [12] - 806:11, 809:10, 809:15, 810:4, 810:19, 815:9, 819:8, 844:24, 845:5, 845:22, 845:25, 847:10
**section** [1] - 841:20
**Section** [2] - 841:21, 842:21
**see** [29] - 800:6, 802:23, 803:15, 804:3, 804:5, 804:18, 806:11, 807:5, 808:4, 808:10, 809:2, 809:17, 811:8, 813:6, 816:7, 831:23, 836:25, 837:3, 844:11, 844:13, 844:16, 845:2, 846:23, 849:14, 851:2, 853:14, 854:4, 854:6, 854:11
**seeing** [2] - 804:6, 818:18
**seeking** [1] - 836:8
**seized** [1] - 836:20
**senior** [1] - 848:22
**sent** [2] - 801:2, 801:4
**sentence** [1] - 851:11
**separate** [2] - 834:25, 854:19
**September** [2] - 797:6, 855:8
**Sergeant** [30] - 803:2, 803:5, 803:12, 804:12, 805:5, 805:13, 807:24, 808:4, 808:23,

809:16, 809:23, 810:5, 810:11, 811:8, 811:15, 811:25, 813:6, 813:16, 815:3, 815:12, 815:22, 817:21, 818:3, 829:1, 831:13, 843:20, 845:9, 848:18, 848:19, 848:24
**sergeant** [3] - 805:7, 807:10, 822:19
**service** [3] - 816:2, 818:5, 828:21
**SESSION** [1] - 797:9
**session** [1] - 854:18
**shooting** [1] - 816:16
**short** [4] - 804:2, 818:7, 830:17, 838:1
**shorthand** [1] - 797:24
**shortly** [1] - 816:22
**shot** [1] - 819:2
**shoulder** [10] - 811:10, 821:20, 822:12, 822:16, 823:5, 823:15, 823:21, 824:1
**shoulders** [1] - 812:25
**show** [6] - 816:21, 821:25, 833:8, 836:7, 837:13, 854:2
**showing** [1] - 854:6
**shown** [3] - 808:24, 819:21, 821:24
**shows** [3] - 821:23, 821:25, 834:6
**side** [8] - 803:17, 805:8, 816:2, 828:13, 849:12, 849:25, 852:6, 852:7
**sign** [1] - 813:10
**SIGNATURE** [1] - 855:9
**signed** [1] - 836:3
**sit** [4] - 817:18, 824:13, 825:10, 853:22
**situation** [4] - 814:22, 827:22, 852:14, 852:20
**situations** [1] - 835:23
**Sixth** [1] - 797:19
**slow** [1] - 839:25
**small** [1] - 848:6
**smash** [2] - 810:1, 850:18
**smashed** [3] - 810:6, 811:16, 813:1

**smashes** [1] - 815:22
**smashing** [3] - 812:25, 814:1, 815:14
**Smith** [3] - 799:8, 840:8, 842:5
**SMITH** [39] - 797:15, 799:8, 802:21, 831:1, 831:10, 831:12, 832:8, 833:11, 833:14, 833:22, 838:4, 838:11, 838:13, 838:17, 838:22, 840:2, 840:9, 840:14, 842:7, 842:8, 845:1, 845:24, 846:16, 846:22, 847:9, 847:16, 849:2, 849:9, 849:23, 850:6, 850:16, 850:25, 851:12, 851:15, 852:2, 852:11, 853:2, 853:8, 854:9
**solve** [1] - 847:25
**someone** [4] - 811:6, 811:7, 819:2, 835:1
**soon** [1] - 844:7
**sorry** [5] - 810:12, 810:13, 810:15, 812:17
**sort** [2] - 843:22, 846:8
**sounds** [1] - 833:20
**south** [1] - 841:24
**Speaker** [3] - 803:13, 803:20, 803:24
**Speaker's** [15] - 804:16, 807:24, 808:25, 843:12, 843:13, 843:15, 843:17, 843:23, 844:3, 844:9, 844:11, 845:15, 846:18, 852:13, 852:20
**speaker's** [1] - 803:16
**speaking** [1] - 822:3
**Special** [15] - 831:1, 831:23, 832:14, 838:14, 838:18, 840:10, 845:2, 846:23, 847:17, 849:4, 849:10, 850:7, 850:17, 852:12
**special** [2] - 840:22, 840:24

**specific** [1] - 843:5
**specifically** [5] - 812:9, 819:18, 820:9, 820:15, 822:7
**spell** [1] - 840:17
**spend** [1] - 831:15
**spending** [1] - 843:10
**spray** [3] - 814:19, 843:25
**sprayed** [1] - 846:11
**stairs** [12] - 814:13, 816:16, 816:19, 818:10, 818:15, 828:8, 828:10, 848:20, 849:6, 849:11, 850:20
**stairway** [4] - 808:25, 828:2, 828:17, 851:18
**stairwell** [3] - 814:3, 816:10, 849:5
**stanchion** [1] - 813:10
**stand** [3] - 801:21, 802:2, 837:12
**STAND** [1] - 803:9
**standing** [12] - 803:20, 803:23, 804:4, 804:7, 804:8, 805:13, 806:8, 819:1, 819:12, 819:13, 822:18, 828:4
**stare** [1] - 844:18
**start** [6] - 804:3, 810:3, 820:2, 838:24, 841:7, 849:21
**started** [5] - 801:6, 804:6, 826:17, 844:19, 852:25
**starting** [1] - 799:7
**state** [4] - 799:6, 821:16, 826:3, 847:23
**STATES** [3] - 797:1, 797:3, 797:10
**States** [7] - 797:13, 797:13, 797:16, 799:5, 799:7, 799:9, 841:5
**stating** [5] - 821:9, 821:18, 827:1, 827:2, 827:3
**stay** [4] - 799:12, 811:20, 849:11, 852:21
**stayed** [2] - 813:19, 849:13
**stenotype** [1] - 797:24
**step** [3] - 820:21,

831:22, 849:5
**Stephen** [1] - 799:13
**steps** [1] - 814:12
**STEVEN** [1] - 797:18
**stick** [1] - 838:6
**still** [10] - 805:8, 812:8, 815:5, 816:4, 816:21, 817:2, 818:23, 848:6, 850:3, 852:5
**stop** [11] - 819:19, 819:21, 819:22, 820:4, 820:8, 820:12, 820:16, 832:12, 839:21, 839:22, 845:21
**stopped** [2] - 845:4, 845:25
**Street** [2] - 797:14, 797:16
**stricken** [1] - 805:25
**strike** [7] - 805:21, 805:22, 811:9, 817:1, 846:14, 851:9, 851:10
**striking** [1] - 816:3
**stuff** [1] - 844:14
**sub** [1] - 854:13
**sub-exhibit** [1] - 854:13
**subpoenaed** [5] - 801:14, 801:15, 802:5, 802:6, 839:13
**suit** [5] - 799:17, 799:19, 800:6, 800:10, 800:11
**suits** [1] - 800:7
**surrounding** [1] - 827:17
**sustained** [7] - 826:10, 827:14, 827:20, 827:25, 846:14, 847:8, 851:10
**SWAT** [1] - 809:4
**SWORN** [1] - 840:12

**T**

**tables** [1] - 836:23
**tactical** [6] - 814:13, 814:14, 851:17, 851:21, 852:4, 852:7
**tall** [1] - 824:16
**taller** [1] - 824:18
**team** [9] - 809:4, 814:13, 814:14, 848:20, 848:21, 851:17, 851:21, 852:4, 852:7

**temporary** [1] - 837:9
**ten** [2] - 830:22, 830:23
**tend** [1] - 835:22
**tends** [1] - 835:23
**terms** [1] - 801:18
**testify** [1] - 837:6
**testimony** [7] - 803:6, 816:22, 831:14, 833:16, 844:10, 853:17, 853:18
**TESTIMONY** [1] - 798:2
**THE** [120] - 797:1, 797:1, 797:10, 799:12, 799:16, 799:24, 800:4, 800:5, 800:8, 800:13, 800:17, 800:20, 801:4, 801:9, 801:12, 801:16, 801:18, 802:5, 802:10, 802:13, 802:24, 803:4, 803:9, 804:24, 805:1, 805:22, 806:18, 806:20, 807:3, 807:5, 807:9, 807:12, 807:14, 807:20, 815:19, 816:13, 816:18, 816:24, 817:4, 817:8, 817:13, 817:17, 817:23, 817:24, 820:1, 820:3, 820:14, 820:15, 820:23, 824:2, 824:3, 825:21, 826:10, 827:8, 827:14, 827:20, 827:25, 828:22, 829:17, 829:18, 830:2, 830:4, 830:12, 830:14, 830:15, 830:16, 830:19, 831:9, 831:11, 831:18, 831:21, 831:25, 832:4, 832:10, 832:17, 832:21, 833:3, 833:12, 833:20, 834:3, 834:14, 834:21, 835:8, 835:11, 835:20, 836:5, 836:19, 836:24, 837:1, 837:3, 837:8, 837:12, 837:25,

838:8, 838:12, 838:16, 838:20, 839:4, 839:11, 839:14, 839:17, 839:20, 840:3, 840:7, 840:12, 842:4, 846:14, 847:8, 851:10, 852:23, 852:24, 853:7, 853:9, 853:16, 853:20, 853:21, 853:25, 854:6, 854:8, 854:14
**theory** [1] - 839:18
**thereafter** [1] - 843:2
**they've** [1] - 802:1
**three** [12] - 800:5, 812:19, 814:5, 814:22, 822:18, 829:23, 831:16, 831:17, 845:6, 845:7, 847:10, 848:23
**three-person** [1] - 848:23
**throughout** [3] - 814:24, 851:7, 851:9
**tie** [1] - 836:12
**Timothy** [1] - 854:18
**TIMOTHY** [2] - 798:3, 803:9
**today** [7] - 802:8, 818:3, 823:20, 824:13, 825:10, 839:9, 839:21
**today's** [1] - 823:4
**together** [1] - 848:19
**took** [1] - 811:20
**top** [1] - 816:10
**towards** [2] - 813:12, 825:12
**transcript** [1] - 855:4
**Transcript** [1] - 797:25
**TRANSCRIPT** [1] - 797:9
**transcription** [1] - 797:25
**trial** [1] - 835:5
**TRIAL** [1] - 797:9
**tries** [2] - 815:23, 815:24
**true** [6] - 818:10, 823:4, 823:20, 827:2, 827:16, 830:8
**truth** [6] - 833:6, 833:13, 833:14, 833:21, 834:3, 835:17
**truthful** [1] - 824:13
**try** [2] - 800:15, 818:7

**trying** [7] - 802:22, 805:16, 816:25, 832:5, 832:15, 847:24, 847:25
**turn** [2] - 814:23, 835:6
**turned** [3] - 824:24, 825:3, 844:18
**twice** [1] - 822:8
**two** [9] - 800:7, 809:14, 814:2, 821:1, 831:15, 834:25, 844:21, 849:5, 851:20
**two-step** [1] - 849:5
**type** [2] - 813:10, 826:13
**types** [1] - 803:18
**typical** [1] - 843:24

**U**

**U.S** [1] - 800:1
**ultimate** [1] - 833:22
**under** [3] - 824:6, 824:12, 854:19
**understood** [2] - 802:3, 826:6
**uniform** [9] - 809:3, 809:5, 826:14, 826:15, 826:17, 843:22, 843:24, 844:1, 846:8
**uniforms** [1] - 814:15
**unit** [1] - 841:20
**Unit** [1] - 826:13
**UNITED** [3] - 797:1, 797:3, 797:10
**United** [7] - 797:13, 797:13, 797:16, 799:5, 799:7, 799:9, 841:5
**unresponsive** [1] - 805:20
**up** [24] - 803:23, 804:10, 805:4, 806:16, 807:22, 808:25, 809:2, 810:3, 813:1, 814:11, 814:13, 815:8, 816:6, 816:17, 818:16, 824:20, 830:4, 837:2, 842:18, 843:15, 844:22, 849:19, 850:22, 853:1
**updated** [1] - 807:7
**upset** [2] - 827:16

**V**

**versus** [1] - 799:5
**vest** [1] - 843:24
**Video** [30] - 805:11, 808:2, 808:15, 808:21, 809:7, 809:12, 809:21, 810:9, 810:16, 811:3, 811:12, 811:23, 812:15, 813:4, 813:14, 815:10, 815:16, 844:25, 845:23, 846:21, 847:15, 849:1, 849:8, 849:22, 850:5, 850:15, 850:24, 851:14, 852:1, 852:10
**video** [27] - 806:6, 807:23, 808:17, 808:24, 809:20, 813:21, 815:1, 819:20, 819:22, 821:23, 821:25, 824:7, 845:2, 845:4, 845:6, 846:7, 846:17, 846:18, 847:5, 848:5, 848:9, 849:14, 850:23, 851:25, 852:4, 852:9
**videos** [2] - 812:19, 831:14
**view** [1] - 851:20
**vigorously** [1] - 830:21
**violent** [1] - 814:1
**visible** [1] - 845:11
**vividly** [1] - 847:21
**voice** [1] - 818:6
**vs** [1] - 797:5

**W**

**wait** [5] - 807:3, 830:17, 832:18, 853:12, 854:3
**waiting** [1] - 802:25
**walk** [2] - 813:17, 839:25
**wall** [2] - 829:25, 850:19
**Walmart** [5] - 833:10, 834:8, 834:22, 834:23, 837:15
**wants** [4] - 823:23, 831:14, 836:16, 854:4
**Washington** [3] -

797:5, 797:14, 797:22
**watched** [2] - 808:18, 819:20
**water** [1] - 820:22
**weapon** [1] - 816:2
**wearing** [7] - 800:9, 804:19, 808:13, 826:15, 826:18, 843:22, 843:24
**week** [1] - 839:5
**welcome** [3] - 803:5, 823:24, 840:7
**whole** [1] - 845:19
**Wick** [2] - 855:3, 855:8
**WICK** [1] - 797:21
**willing** [1] - 800:8
**window** [9] - 810:1, 811:9, 812:2, 812:4, 812:5, 812:25, 813:1, 815:23, 825:7
**windowpanes** [1] - 804:5
**windows** [10] - 810:6, 811:16, 812:7, 812:12, 813:21, 814:1, 815:14, 824:9, 825:9, 826:4
**witness** [17] - 808:8, 819:25, 830:12, 830:16, 830:25, 831:7, 831:9, 831:10, 831:18, 831:21, 832:7, 832:11, 838:13, 839:2, 839:23, 840:11
**WITNESS** [10] - 803:9, 817:23, 820:3, 820:15, 824:3, 829:18, 830:15, 840:12, 852:24, 853:20
**Witness** [2] - 805:6, 808:7
**witness's** [1] - 823:23
**witnesses** [3] - 801:14, 831:24, 838:10
**words** [3] - 813:1, 824:21, 851:5
**worn** [1] - 800:11
**wrote** [1] - 831:24

**Y**

**Y-e-t-t-e-r** [1] - 840:19
**year** [2] - 840:25, 841:10
**years** [1] - 841:6

**yelling** [5] - 805:15, 805:23, 811:6, 811:7, 846:6
**yesterday** [3] - 803:12, 806:23, 812:9
**YETTER** [2] - 798:6, 840:12
**Yetter** [24] - 804:9, 810:22, 811:8, 822:17, 822:18, 822:20, 822:21, 823:2, 823:5, 831:1, 831:20, 838:14, 840:10, 840:19, 845:2, 846:23, 847:17, 849:3, 849:4, 849:10, 850:7, 850:17, 852:12, 853:16
**Yetter's** [2] - 822:16, 824:1
**York** [2] - 797:20
**yourself** [11] - 804:18, 805:5, 806:12, 808:4, 808:6, 814:18, 818:23, 819:22, 843:14, 845:2, 849:14

**Z**

**ZACHARY** [1] - 797:6
**Zachary** [1] - 799:5